ORRIA–MEDINA, et al., Plaintiff(s)

v.

METROPOLITAN BUS AUTHORITY, et al., Defendant(s).

Civil No. 06–1643 (JAG).

United States District Court, D. Puerto Rico.

Sept. 6, 2007.

Juan Jose Nolla–Acosta, Urb. Valle De Andalucia, Ponce, PR, Nicolas Nogueras–Cartagena, Nicolas Nogueras Law Offices, San Juan, PR, for Plaintiffs.

Gerardo A. De–Jesus–Annoni, Quinones, Sanchez & Guzman, PSC, Joy C. Vilardi–

Rizzuto, Teresa S. Zapata–Valladares, P.R. Department of Justice–Federal Litigation, San Juan, PR, for Defendants.

Adaline Torres–Santiago, Hato Rey, PR, pro se.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

The original complaint in this case was filed on June 28, 2006 (Docket No. 1). Amended Complaints were filed on July 10, 2006, on November 14, 2006 and on January 23, 2007. (Docket Nos. 3, 23, 45). In the Second Amended Complaint (of January 23, 2007), plaintiffs Emilio Orria–Medina, Emilio R. Orria–Cruz, Agnes L. Repullo, Iliana Rivera Reyes, Violeta Albino, Alba Toro, Aileen G. Curas–Negron, Jose J. Ocasio–Rodriguez, Jose M. Nieves–Rios, Wanda D. Diaz–Gomez and Vanessa Delgado–Rodriguez (collectively "plaintiffs") seek compensation for economic, emotional and moral damages and injunctive relief from certain actions allegedly performed by defendants (1) the Metropolitan Bus Authority ("MBA"); (2) the Puerto Rico Department of Transportation and Public Works ("DTPW"); (3) the Commonwealth of Puerto Rico ("Commonwealth"); (4) Mr. Gabriel Alcaraz–Emanuelli ("Alcaraz–Emanuelli"), in his official capacity as Secretary of the DTPW and in his personal capacity, his spouse "X" and the conjugal legal partnership constituted between them; (5) Ms. Adaline Torres–Santiago ("Torres–Santiago"), in her personal capacity only; (6) Mr. Evans Gonzalez–Baker ("Gonzalez–Baker") in his official capacity as President of the MBA and in his personal capacity, his spouse "Y" and the conjugal legal partnership constituted between them; (7) Mr. Manuel Mirabal ("Mirabal") in his official capacity as Administrator of the "Llame y Viaje" ("Call & Ride") program of the MBA and in his personal capacity, his spouse "Z" and the conjugal legal partnership constituted between them; and (8) John Doe, Jane Roe, and insurance companies A, B, C, D & E (collectively "defendants"), under (1) the First, Fifth and/or Fourteenth Amendments to the U.S. Constitution, (2) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, (3) Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794, (4) the Civil Rights Remedies Equalization Act, 42 U.S.C. § 2000d–7 ("CRREA"), (5) 42 U.S.C. §§ 1981 and/or 1981a, 1983, 1985 and 1988 ("Sections 1981, 1981a, 1983, 1985 and 1988" respectively) and (6) several provisions of the Code of Federal Regulations. Also, plaintiffs invoke the Court's supplemental jurisdiction alleging violations to §§ 1, 4, 6–8 and 16 of Article II of the Constitution of the Commonwealth of Puerto Rico; Act No. 238 of August 31, 2004 (Bill of Rights for Persons with Disabilities), P.R. Laws Ann. tit. 1, §§ 512(a)–512(k); Act No. 170 of August 12, 1988 (Uniform Administrative Procedures Act), P.R. Laws Ann. tit. 3, §§ 2101–2201 ("UAPA"); Act No. 21 of May 31, 1985 (Uniform Rate Revision and Modification Act), P.R. Laws Ann. tit. 27, §§ 261–261(e) ("URRMA"); and Art. 1802 of the Puerto Rico Civil Code (the Commonwealth's general tort statute), P.R. Civil Code, P.R. Laws Ann. tit. 31, § 3151.

On October 2, 2006, the MBA, González–Baker, Mirabal and the Commonwealth filed a Motion to Dismiss under Fed. R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6). (Docket No. 9). On October 13, 2006, the DTPW and Alcaraz–Emanuelli requested leave to join the Motion to Dismiss and the Court granted said request. (Docket Nos. 18, 19). On December 13, 2006, plaintiffs filed a "Response in Opposition to Motion to Dismiss." (Docket No. 33). On January 2, 2007, Commonwealth, the MBA, Gonzalez–Baker and Mirabal filed a motion

replying to the Opposition to Motion to Dismiss. (Docket No. 36).

On April 4, 2007, the MBA filed another Motion to Dismiss the complaint under Fed.R.Civ.P. 12(b)(6).[1] (Docket Nos. 58, 59). On April 30, 2007, plaintiffs responded in opposition to this Motion to Dismiss. (Docket No. 73). The MBA replied to plaintiffs' response on May 7, 2007. (Docket No. 76).

On April 4, 2007, plaintiffs filed a Motion Requesting Temporary Restraining Order and/or Preliminary Injunction. (Docket No. 61). On April 5, 2007, the Court denied plaintiffs' motion for temporary restraining order and referred the motion for preliminary injunction to Magistrate–Judge Marcos Lopez. (Docket No. 62). The Court also referred to the Magistrate–Judge all pending motions in this case for Report and Recommendation, where appropriate. On May 16, 2007, the Magistrate–Judge issued his Report and Recommendation on the two Motions to Dismiss (Docket Nos. 9, 18, 58, 59).

On May 31, 2007, the MBA filed objections to the Report and Recommendation (Docket No. 80) and so did plaintiffs (Docket No. 81). For the reasons discussed below, the Court **ADOPTS in PART and REJECTS in PART** the Magistrate–Judge's Report and Recommendation.

## FACTUAL BACKGROUND[2]

This suit involves the Call and Ride program administered by the MBA. The MBA is a public corporation and instrumentality of the Commonwealth of Puerto Rico created by the Metropolitan Bus Authority Act, Act No. 5 of May 11, 1959, as amended. P.R. Laws Ann. tit. 23, §§ 601–620 ("MBA's enabling act"). The MBA's primary goal is to provide, develop, maintain and administer a public mass transportation system to residents and visitors of the San Juan Metropolitan area. P.R. Laws Ann. tit. 23, § 606. As part of its services, the MBA created the Call and Ride program to provide paratransit transportation services to persons with physical and/or mental disabilities that are not able to benefit from the MBA's regular services. Users must be subscribed to the Call and Ride program and make reservations in order to receive transportation services from said program. All plaintiffs in this case claim to be participants and regular users of the Call and Ride program.

According to the Second Amended Complaint, until June 2005, the rates for the Call and Ride services had been held constant at around $0.50 per trip per customer, up to a maximum of $1.50. These rates were twice the rates paid by users of the "regular" bus service. However, on or around June 2005, the MBA determined to revise its tariff schedule for all its services, including the Call and Ride program.

The MBA published advertisements announcing the holding of public hearings with the purpose of revising the MBA's tariff system, without making a specific indication that the rates for the Call and Ride program were going to be revised as well. In particular, plaintiffs claim that the MBA did not specifically inform the users of the Call and Ride program that it was considering raising the rates, and that a reasonable person would have thought,

---

1. The MBA attached various exhibits to its Motion to Dismiss. However, the Court does not deem it necessary to consider said exhibits in disposing of this matter. As such, the Motion to Dismiss will not be converted into a Motion for Summary Judgment.

2. The Court culls the relevant facts from the Magistrate Judge's Report and Recommendation.

based on the announcements, that only the rates for the MBA's regular routes, not the Call and Ride program's rates, would be revised. These actions, plaintiffs assert, constitute a violation of the procedures set forth by 49 C.F.R. § 37.137(c), the UAPA, the URRMA and the Bill of Rights for Persons with Disabilities, inasmuch the notices of the public hearings on the proposed rate increase were not specific enough and did not allow those affected by the increase to become aware that any opposition to the raise had to be presented at the hearings.

On November 10, 2005, defendant Torres–Santiago, the MBA's then-president, mailed a letter to the users of the Call and Ride program informing that on November 16, 2005, the rates for the program would be increased. Plaintiffs claim that this notification was defective, as any change in the program has to be notified no less than 10 days before the scheduled date of implementation of such change and therefore, even if the rate increase had been properly authorized, it could not become effective until November 20, 2005, at the earliest.

After users of the Call and Ride program became aware of the proposed increase, they began to publicly complain about the decision. As a result of said complaints, the Puerto Rico House of Representatives' Committee on Consumer Affairs ("Committee") decided to hold public hearings between mid-December 2005 and February 2006 on how the rates had been increased and on whether the proceedings for raising the rates were conducted in compliance with the law. The Committee scheduled hearings for December 7, 2005, and its chairman, Representative Jorge Navarro–Suarez, publicly announced the holding of hearings to investigate the matter.

Several users of the Call and Ride program, including plaintiff Emilio Orria–Medina, upon learning of the hearing, called to make reservations to be transported to the Capitol building in San Juan to participate in the hearings, instead of their usual routes. The reservations were entered in the system normally. However, around December 6, 2005, Torres–Santiago became aware that many users of the program wanted to attend the hearings held by the Committee to complain about the rate increase, as well as about other problems and alleged abuses. Plaintiffs assert that Torres–Santiago became enraged at the prospect of clients of the Call and Ride program complaining. Furthermore, plaintiffs allege that Torres–Santiago was well aware of who these clients were and what they would complain about since she had personally met with some of them. Plaintiffs not only wanted to complain about the rate increase, but also about the continuous mistreatment they are subjected to, including rude comments by bus drivers, bus drivers of the regular service who do not want to activate ramps for users who need them to enter the buses, and other types of verbal and psychological abuse.

Plaintiffs claim that in order to minimize criticism of the Call and Ride program and avoid plaintiffs' participation in the hearings, Torres–Santiago pressured the then-director of the program, Mrs. Maria Cordero–Rodriguez, to make those reservations "disappear." Allegedly, Torres–Santiago specifically indicated that she did not want those customers to attend the hearing to express their complaints. Torres–Santiago allegedly told Ms. Cordero-Rodriguez something like "these [people] want to speak badly about us and they expect us to transport them there." Plaintiffs also state that defendant Mirabal, who was the administrator of the Call and Ride program, actively participated in this

scheme. Plaintiffs claim that Torres–Santiago's actions constitute an infringement of their First Amendment rights and a direct violation to 49 C.F.R. § 31.131(d),[3] which prohibits the imposition of restrictions or priorities based on the purpose of the trip. According to the Second Amended Complaint, Torres–Santiago imposed the cancellation of the trips solely because of the purpose of the customers to complain about the program. Plaintiffs further assert that Torres–Santiago invited other users of the Call and Ride program to attend the hearings to testify favorably about the MBA and ordered arrangements to be made to provide them transportation to the hearings. Plaintiffs also allege that Alcaraz–Emanuelli was aware of Torres–Santiago's scheme and that he did not take any action on the matter until the situation became public.

Furthermore, the Second Amended Complaint states that the MBA officials have also diverted buses from the Call and Ride program to official and/or political activities, such as the 2003 and 2004 celebrations of the Commonwealth Constitution. Some buses assigned to the Call and Ride program were used to transport people without physical limitations to those activities, which were held in areas outside the coverage areas of the program. To cover up the illegal use of the buses, plaintiffs claim that the drivers were ordered not to report the use given to the buses on those days.

Plaintiffs request through the Second Amended Complaint that the rate increase be declared null and void since it was illegally approved and implemented by the MBA. Plaintiffs also assert that defendants' actions resulted in "economic, emotional and moral" damages to all plaintiffs. They claim to have experienced "great distress and anxiety, thinking that the defendants can attempt to take advantage of their disadvantaged position to retaliate against them for their vocal criticism of what they genuinely feel are deficiencies in the Call [and] Ride program." In particular, plaintiffs claim to have suffered dire economic consequences from the rate increase. Therefore, plaintiffs claim to be entitled to reimbursement for the moneys they have been paying and continue paying daily since the allegedly illegal increase went into effect. Plaintiffs estimate this amount "at much more than $100,000.00 per user of the program." Plaintiffs also request compensation in the amount at least $500,000.00 per user of the program for the moral damages they claim to have suffered, including anxiety, depression, continuous fear, insomnia and post-traumatic stress disorder and damages to their self esteem. Plaintiffs further request punitive damages in the amount of at least $1,000,000.00 per defendant, in light of the "seriousness of the situation, and to set an example so that abuses like this against our most vulnerable citizens don't happen again." Additionally, plaintiffs request that in the case of the individual defendants, punitive damages be paid out of their own resources and not from the resources of the people of Puerto Rico.

Finally, plaintiffs request the Court to prohibit the MBA (1) from taking reprisals against plaintiffs and the users of the program, and (2) from charging the increased rates until this Court determines if the process for its increase was done in compliance with applicable federal and state laws and regulations. It is also requested that the MBA, its officers, agents, drivers and employees be enjoined (1) from mistreating plaintiffs and (2) from mistreating disabled persons who wish to travel in the

---

**3.** Plaintiffs must refer to 49 C.F.R. § 37.131(d), and not to 49 C.F.R. § 31.131(d).

"regular" buses and require their assistance.

## DISCUSSION

### A. *Motion to Dismiss Standard*

Pursuant to Fed.R.Civ.P. Rule 12(b)(6), under which a defendant may move to dismiss for failure to state a claim upon which relief can be granted, a complaint may not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Brown v. Hot, Sexy, and Safer Prods., Inc.*, 68 F.3d 525, 530 (1st Cir.1995). The Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990). The Court need not credit, however, "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the Complaint's allegations. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). When opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Tech.*, 950 F.2d 13, 22 (1st Cir.1991). Plaintiffs are responsible for putting their best foot forward in an effort to present a legal theory that will support their claim. *Id.* at 23 (*citing Correa–Martinez*, 903 F.2d at 52). Plaintiffs must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988).

Pursuant to Fed.R.Civ.P. 12(b)(1), a defendant may move to dismiss an action for lack of subject matter jurisdiction. As courts of limited jurisdiction, federal courts have the duty of narrowly construing jurisdictional grants. *See e.g., Alicea–Rivera v. SIMED*, 12 F.Supp.2d 243, 245 (D.P.R.1998). Since federal courts have limited jurisdiction, the party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. *See Murphy v. United States*, 45 F.3d 520, 522 (1st Cir.1995); *Droz–Serrano v. Caribbean Records Inc.*, 270 F.Supp.2d 217 (D.P.R. 2003). When deciding whether to dismiss a complaint for lack of subject matter jurisdiction, the Court "may consider whatever evidence has been submitted, such as ... depositions and exhibits." *See Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir.1996). Motions brought under Rule 12(b)(1) are subject to the same standard of review for Rule 12(b)(6) motions. *Negron–Gaztambide v. Hernandez–Torres*, 35 F.3d 25, 27 (1st Cir.1994); *Torres Maysonet v. Drillex, S.E.*, 229 F.Supp.2d 105, 107 (D.P.R.2002).

Under Rule 12(b)(6), dismissal is proper "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Gonzalez–Morales v. Hernandez–Arencibia*, 221 F.3d 45, 48 (1st Cir.2000) (*quoting Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990)). Under Rule 12(b)(1) dismissal would be proper if the facts alleged reveal a jurisdictional defect not otherwise remediable.

### B. *Standard for Reviewing a Magistrate–Judge's Report and Recommendation*

A District Court may, on its own motion, refer a pending motion to a U.S. Magistrate–Judge for a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Local Civ. Rule 72(a). Pursuant to Fed.R.Civ.P. 72(b) and Local Civ. Rule 72(d), the adversely affected party may contest the Magistrate–Judge's Report and Recommendation by filing written objections "[w]ithin ten days of being

served" with a copy of the order. *See* 28 U.S.C. § 636(b)(1). Since both, plaintiffs and defendants have filed timely objections to the Magistrate–Judge's Report and Recommendation in this case, the Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which specific objection is made. *See United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Lopez v. Chater*, 8 F.Supp.2d 152, 154 (D.P.R.1998).

### C. *The MBA's Objections to the Report and Recommendation*

The MBA objects to the Magistrate–Judge's conclusion that it does not enjoy Eleventh Amendment immunity and is therefore not immune from suit in federal court.

█ The Eleventh Amendment of the U.S. Constitution provides that: "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens ·or subjects of any Foreign State." U.S. Const. Amend XI. The Eleventh Amendment bars a suit brought in federal courts for monetary damages against a state, unless the state being sued has waived its immunity or consents to be sued.[4] Moreover, Eleventh Amendment protection extends to the instrumentalities of the state. *See Maysonet–Robles v. Cabrero*, 323 F.3d 43, 48–49 (1st Cir.2003). As such, the Eleventh Amendment offers a protection that renders states themselves and "arms" of states immune from claims brought in federal courts. *Metcalf & Eddy v. Puerto Rico Aqueduct & Sewer Authority*, 991 F.2d 935, 939 (1st Cir.1993). The entity asserting immunity bears the burden of showing that it is an arm of the state. *Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1 Cir.2003) *citing Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 99 (1st Cir.2002). The question of whether a certain entity is considered an arm of the state for Eleventh Amendment purposes is one of federal law. *Fresenius*, 322 F.3d at 61 *citing Regents of the University of Cal. v. Doe*, 519 U.S. 425, 429 n. 9, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997).

In *Fresenius*, the Circuit Court decidedly reshaped its arm-of-state test in light of Supreme Court precedent since *Metcalf & Eddy*. The arm-of-state analysis is governed by the twin goals of the Eleventh Amendment, as established by the Supreme Court: (1) protection of the state's treasure and (2) protection of the state's dignitary interests. *Fresenius*, 322 F.3d at 61 (*citing Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 39–41, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)). Furthermore, courts are cautioned that "[i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty" since "[t]he consequences of an arm-of-the-state finding are considerable." *Fresenius*, 322 F.3d at 63.

The test set forth in *Fresenius* is two-pronged: First, the court must examine whether the state has clearly structured the entity to share its sovereignty, and second, if the structural indicators point in different directions and the first prong

---

**4.** The Commonwealth of Puerto Rico is considered a state for Eleventh Amendment purposes. *See Bernier–Aponte v. Izquierdo–En-* *carnacion*, 196 F.Supp.2d 93, 98 (D.P.R.2002) (*citing Negron Gaztambide v. Hernandez Torres*, 145 F.3d 410 (1st Cir.1998)).

cannot be answered in the affirmative, the court must ascertain "the risk that money damages will be paid from the public treasury" if the entity is found liable, that is, "whether the state has obligated itself to pay the entity's indebtedness." *Id.* at 68. In examining the first prong, the court in *Fresenius* considered (1) whether the entity's enabling act and other relevant statutes make the entity an arm of the state, or whether it was structured as a separate entity that can sue and be sued and has a budget independent from the state's, (2) whether the state has claimed or disclaimed responsibility over the entity's debts, (3) how the state courts have treated the entity, (4) whether the entity's functions are governmental in nature, and (5) the degree of control exerted by the state over the entity. Regarding the second prong, if "it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." *Fresenius,* 322 F.3d at 65.

The Magistrate–Judge determined that the first prong of the *Fresenius* test proved inconclusive because some factors point towards a structure that is independent of the state and its sovereignty and others point in the opposite direction.[5] However, the Magistrate–Judge found that the second prong of the *Fresenius* test conclusively points to a finding the MBA is not an arm of the state.

The MBA sustains that the first prong of the *Fresenius* test is met because "the factors pointing toward a structure in which the [MBA] shares the Commonwealth's sovereignty outweigh the factors pointing toward a structure with certain degree of autonomy." The MBA listed in its Motion to Dismiss the following factors as pointing toward a structure in which it shares the Commonwealth's sovereignty: (i) the MBA is required to submit annual financial statements and status reports to the Governor and Legislature; (ii) the MBA is exempt from payment of Commonwealth and municipal taxes, duties and fees; (iii) the MBA is only authorized to deposit its funds in institutions approved by the Commonwealth; (iv) the MBA is

**5.** Specifically, the Magistrate–Judge found that the following factors weighed in favor of a structure that is autonomous: the MBA was created as a "public corporation having legal existence and personality separate and apart from those of the Government and from any of the officers thereof," P.R. Laws Ann. tit. 23, § 603(a); the MBA operates, for constitutional purposes, as a private enterprise or business, P.R. Laws Ann. tit. 23, § 602(a); the MBA's enabling act empowers it to (1) have perpetual existence as a corporation, (2) sue and be sued, (3) enter into contracts leases, agreements, or other transactions with federal agencies, the Commonwealth or political subdivision thereof, (4) and acquire and maintain property, Id., § 606; the MBA is allowed to generate revenue by fixing, altering, charging and collecting reasonable rates, fees or rentals, P.R. Laws Ann. tit. 23, § 606(*l*); the MBA has authority to borrow money and issue bonds, and the Commonwealth (or any of its political subdivisions) will not be liable for the payment of the principal of or interest on any such bonds, P.R. Laws Ann. tit. 23, 9 § 606(n), (*o*); the MBA is permitted to accept grants or donations from persons and private entities and to acquire, hold and dispose of stock, contracts, bonds or other interests in other corporations.

The following factors were found by the Magistrate–Judge to weigh in favor of a structure that is an arm of the state: the MBA is required to submit annual financial statements and status reports on certain subjects to the Governor and Legislature, Id., § 620; the MBA is exempted from payment of Commonwealth and municipal taxes, duties and fees, P.R. Laws Ann. tit. 23, § 619; the MBA is ascribed to the DTPW; the MBA's Board of Directors was eliminated and its powers and faculties transferred to the Secretary of the DTPW, Section 3 of the 1971 Reorganization Plan No. 6, effective Jan. 2, 1973, P.R. Laws Ann. tit. 3, App. III.

ascribed to the DTPW; (v) the MBA does not have a Board of Directors, and reports directly to the Secretary of the DTPW; (vi) the MBA's powers are vested in and exercised by the Secretary of the DTPW; (vii) the DTPW is the central organization for planning, promoting and coordinating all governmental activities in the field of transportation; (viii) the Secretary of the DTPW has the faculty to adjust the operations of the MBA to the objectives, planning and programming adopted by the DTPW; and (ix) the President and General Manager of the MBA, as well as all the officials participating in the operation policy making and overall management of the MBA are appointed by the Secretary of the DTPW. The factors pointing toward a structure in which the MBA has autonomy are, according to the MBA, contained in the statutory provisions indicating that the Commonwealth is not liable for the MBA's debts, that it has a legal existence and personality separate from the Commonwealth's and that it can enter into leases and acquire property on its own.

We embark on the analysis of the factors relevant to the first part of the *Fresenius* test, turning first to the MBA's enabling act. The MBA's enabling act defines the MBA as an entity which "shall, for constitutional purposes, operate as a private enterprise or business." P.R.Laws Ann. tit. 23, § 602. Furthermore, it creates the MBA as "[a] body corporate and politic constituting a public body and governmental instrumentality of the Commonwealth of Puerto Rico ... to act on its own authority ... [as] a public corporation having legal existence and personality separate and apart from those of the Government and from any of the officers thereof." Id. § 603. The enabling act also specifically grants the MBA the power to sue and be sued, and to raise its own revenue by charging fees for its services, borrowing money and issuing bonds. Id. § 606. The

MBA does not need legislative approval do to so. On the other hand, the enabling act exempts the MBA from payment of taxes on its revenues and properties. Id. § 619.

Second, we turn to ascertaining whether the Commonwealth has claimed or disclaimed responsibility for the MBA's debts. Clearly, the enabling act disclaims the Commonwealth's responsibility over the MBA's debts: "[t]he debts, obligations, contracts, bonds, notes, debentures, receipts, expenditures, accounts, funds, undertakings and property of the Authority, its officers, agents or employees shall be deemed to be those of said government-controlled corporation and not to be those of the Commonwealth Government or of any office, bureau, department, commission, dependency, municipality, branch, agent, officer or employee thereof." Id. Moreover, the enabling act specifically states that the Commonwealth will not assume as debt the bonds issued by the MBA and that the bonds will not be payable out of funds other that those of the MBA. Id. §§ 614, 616.

The third factor is how state courts have treated the entity. The parties have not provided the Court with any state court opinions discussing this matter. It is the moving parties' burden to do so and so we move on to the fourth factor, which considers whether an entity's functions are governmental in nature.

We find *Morrison–Knudsen Co., Inc. v. Massachusetts Bay Transp.*, 573 F.Supp. 698, 704 (D.C.Idaho, 1983) particularly helpful in determining the MBA's nature. In *Morrison–Knudsen,* the court found that since the Massachusetts Bay Transportation Authority only served the greater Boston area, it could not be said to be executing a governmental purpose. The fact that the Authority serves a public purpose does not mean that it functions in

a governmental capacity on behalf of the Commonwealth of Massachusetts. *Id.* Similarly, the MBA was created to provide public transportation to the metropolitan area of the island of Puerto Rico and not the entire Commonwealth. The MBA's purpose it to "develop and improve, own, operate and manage any and all types of overland passenger transportation facilities and services in and through the territory comprising the Capital of Puerto Rico and the Metropolitan Area." P.R.Laws Ann. tit. 23, § 606. Since the MBA was created to further a local interest, it can be said to be performing a proprietary rather than a governmental function. Lastly, we must consider the extent of the Commonwealth's control over the MBA.

The following facts demonstrate the control exerted by the Commonwealth over the MBA: (1) the MBA is required to submit annual financial statements and status reports to the Governor and Legislature; (2) the MBA is only authorized to deposit its funds in institutions approved by the Commonwealth; (3) the MBA is ascribed to the DTPW; (4) the MBA does not have a Board of Directors, and reports directly to the Secretary of the DTPW; (5) the MBA's powers are vested in and exercised by the Secretary of the DTPW; (6) the Secretary of the DTPW has the faculty to adjust the operations of the MBA to the objectives, planning and programming adopted by the DTPW; and (7) the President and General Manager of the MBA, as well as all the officials participating in the operation policy making and overall management of the MBA are appointed by the Secretary of the DTPW. These circumstances show that the MBA's finances are subject to the supervision of the Legislature and the Governor and that its opera-

tions are subject to the supervision of the DTPW. The MBA gives much weight to the fact that the Secretary of the DTPW, and not a Board of Directors, is now in charge of overseeing the MBA. It should be pointed out, however, that the Supreme Court of Puerto Rico has stated that in spite of the fact that the Board of Directors of the MBA was abolished and replaced by the authority of the Secretary of the DTPW, the MBA's nature as a private business is not deemed to have changed. *See Union de Empleados Carreteras v. J.R.T.,* 119 P.R.Dec. 116, 128, n. 15 (1987).[6]

Most of the factors considered in the first prong of the *Fresenius* test weigh in favor of finding that the MBA is not structured to share the Commonwealth's sovereignty. To be sure, however, the Court turns to analyze the second prong of the *Fresenius* test, which considers the risk that the damages suffered by a plaintiff suing the entity will be paid from the public treasury.

The Magistrate–Judge determined that the Commonwealth has no obligation to pay for the MBA's debts. He based his conclusion upon a finding that the MBA's enabling act does not bind the Commonwealth to subsidizing the MBA's services but instead establishes that the MBA's "debts, obligations ... shall be deemed to be those of said government-controlled corporation and not to be those of Commonwealth Government." This wording led the Magistrate–Judge to conclude that the MBA is fiscally autonomous and the Commonwealth has no obligation to pay the MBA's debts. As such, the Magistrate–Judge found that the MBA is not an arm of the Commonwealth and is therefore not entitled to Eleventh Amendment im-

---

**6.** This case is an unpublished opinion of the Supreme Court of Puerto Rico and is not binding on state courts.

munity. The analysis however, should not end here.

In conducting the inquiry of whether the state is responsible for an entity's debts, courts should examine "what is said by state law on the topic *and what in fact has happened.*" *Fresenius,* 322 F.3d at 72 (emphasis ours). As such, a court's analysis of whether a state is liable for a public corporation's debts is not complete after looking at the corporation's enabling act or other statutory provisions that establish its funding structure or sources. The court must look at other factors to determine whether as a practical matter, and in spite of statutory provisions to the contrary, the Commonwealth would end up paying for the public corporation's debts. In sum, the analysis to be followed in considering the second prong of the *Fresenius* test is: "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No'—both legally and practically—then the Eleventh Amendment's core concern is not implicated." *Fresenius,* 322 F.3d at 72 *citing Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 51, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

The MBA sustains that "at least for the last decade, the Commonwealth annually funded [the MBA] with substantial amounts from the public treasury" and that "[t]his is enough to conclude that the Commonwealth in fact assumed the obligation to provide all the funds needed by [the MBA] to balance its budget and to maintain its operation." According to the MBA, the Commonwealth has an interest in maintaining its operation because the MBA is governmental in nature. Since the MBA's real cost of operation is much higher than the revenue it receives from fares, the Commonwealth has "assumed" the obligation of funding the MBA in order

for it to balance its budget. Because of this, the MBA argues, the Commonwealth anticipates budget shortfalls and the MBA is constantly dependent on the state. This in turn creates a risk that the damages will be paid from the public treasury. Accordingly, in spite of the statutory provision stating that the Commonwealth is not liable for the MBA's debts, the MBA sustains that it has been structured in a way that renders it dependent on the Commonwealth.

In analyzing the second prong of the *Fresenius* test, we must first turn to state law, which is clear on the matter. As stated above, the MBA is a public corporation and instrumentality of the Commonwealth of Puerto Rico created by Act No. 5 of May 11, 1959, as amended. P.R. Laws Ann. tit. 23, § 601 *et seq.* Pursuant to said enabling act, the Commonwealth is not responsible for paying the MBA's debts. However, notwithstanding the statutory provision, the Commonwealth could, as a practical matter, end up paying the MBA's debts.

The MBA sustains that the Commonwealth has been subsidizing the MBA for years because its fee structure does not cover its operating costs and that this renders the MBA constantly dependent on the Commonwealth. Specifically, the MBA alleges that in the fiscal year 2005–2006, the Commonwealth granted $19,955,835.00 to subsidize its operating costs and expenses, which amounted to $79,006,242.00. These figures translate to a subsidy by the Commonwealth of around 25% of the MBA's cost and expenses in that fiscal year. The question then becomes whether these circumstances are sufficiently significant to cancel the Commonwealth's express disclaimer of responsibility over the MBA's debts and lead the Court to conclude that as a practical matter, the Commonwealth will end up paying for damages imposed on

the MBA. The Court finds that they are not.

The MBA cites *In re San Juan Dupont Plaza Hotel Fire Litigation*, 888 F.2d 940 (1st Cir.1989). In that case, the District Court found that the Tourism Company, a public corporation, was an arm of the Commonwealth and therefore protected by Eleventh Amendment immunity. On appeal, the appellant argued that "the Eleventh Amendment should not apply, because Puerto Rico law provides that the Commonwealth will not be liable for the debts of the Tourism Company." *Id.* at 943. The Circuit Court, however determined that "[n]otwithstanding the statutory provision stating that the Commonwealth is not responsible for the debts of the Tourism Company, the district court found that roughly 70–75 percent of the funds available to the Tourism Company are provided by the taxpayers of the Commonwealth" and concluded that "[t]o that extent, a judgment enforced against the Tourism Company is effectively a liability of the Commonwealth." *Id.* at 943–44. (citations omitted). Like in the case of the Tourism Company, there is a statutory provision in the case of the MBA that states that the Commonwealth will not respond for the debts of the MBA. However, the case of the Tourism Company is significantly different from the case at hand the Commonwealth offered a subsidy of 70–75% to the Tourism Company, while it allegedly offers around 25% to the MBA. (*See also De Romero v. Institute of Puerto Rican Culture*, 466 F.Supp.2d 410 (D.P.R. 2006), where Institute's enabling act did not contain any provision either claiming or disclaiming the Commonwealth's responsibility for the entity's debts, the Commonwealth's subsidy of 96% of the Institute's funds established the Institute's entitlement to Eleventh Amendment Immunity.)

The Court does not ignore the MBA's allegation that it is constantly dependent on the state because it operates on a deficit. In this regard, the MBA cites *Hess*, in which the Supreme Court considered, in determining whether a money judgment would be satisfied with state funds, whether as a practical matter, the entity is "constantly dependent on funds from the government to meet its sizable operating deficits." *Hess*, 513 U.S. at 50–51, 115 S.Ct. 394. The court in *Hess* stated: "[W]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency." *Id.*

In discussing the matter of budget shortfalls and satisfaction of judgments by the state, *Hess* cited *Morris v. Washington Metropolitan Area Transit Authority*, 781 F.2d 218 (D.C.Cir.1986) and *Alaska Cargo Transport, Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir.1993). These cases presented very different circumstances than those of this case. In *Morris*, the court concluded that any judgment against the entity would be paid by the state because the fare revenues "never came close" to covering the costs and that the budget shortfall was anticipated. However, the court gave much weight to the fact that the entity's enabling act provided that any remaining costs were to be paid by the local governments. This is not the case with the MBA, which has been structured to be financially independent.

In *Alaska R.R.Corp.*, the convincing factor in the determination that the entity was entitled to Eleventh Amendment immunity was that its enabling act stated that it could, with the permission of the governor, directly ask the legislature for a grant to help it carry out the provisions of

its statutory mandate. The court interpreted this as a requirement to seek funds to maintain service. Accordingly, the court concluded that "if faced with a large money judgment, ARRC would be compelled to turn to legislative appropriation in order to remain in business, and the legislature would have to respond favorably so that the 'essential' transportation function would continue to be performed and to protect the state's very substantial investment in the Alaska Railroad." *Alaska R.R. Corp.*, 5 F.3d at 381. The MBA's enabling act does not grant it the power to require the legislature an endowment in order to stay afloat. Any subsidy afforded to the MBA has been voluntarily supplied by the Commonwealth.

The Commonwealth's subsidy of the MBA's operation has not only been voluntary but also not particularly substantial. The Commonwealth has not, either legally or practically, obligated itself to pay for the MBA's debts. This leads us to conclude that damages are not likely to be paid out from the public treasury. Accordingly, the second prong of the *Fresenius* test has not been met. Having failed to prove that it is an arm of the Commonwealth of Puerto Rico, the MBA is not entitled to share the Commonwealth's Eleventh Amendment immunity.

### D. *Plaintiffs' Objections to the Report and Recommendation*

Plaintiff objects to two of the Magistrate–Judge's recommendations: (1) that the DTPW's request for dismissal of the claims under the Rehabilitation Act on Eleventh Amendment immunity grounds be granted and (2) that the MBA's request for dismissal of all claims under sections 1983 and 1988 be granted.

#### (1) *Rehabilitation Act claims*

Plaintiffs argue that the DTPW does not enjoy Eleventh Amendment immunity un-

der the Rehabilitation Act because it receives federal funding from the United States Department of Transportation and because the scope the concept of "programs and activities" in the Rehabilitation Act causes the DTPW to have waived its sovereign immunity under said act. Specifically, plaintiffs sustain that the MBA is a DTPW program or activity, which has received federal funding, directly or indirectly.

Eleventh Amendment immunity is not absolute and may be waived or "stripped away" by Congress. *Metcalf & Eddy*, 991 F.2d at 938. There are four circumstances in which Eleventh Amendment immunity unravels: (1) when a state consents to be sued in a federal forum; (2) when a state waives its own immunity by statute or the like; (3) when Congress abrogates state immunity; and (4) when, provided that circumstances allow, other constitutional imperatives take precedence over the Eleventh Amendment's protection. *Id.* at 938 (citations omitted); *see Toledo v. Sanchez*, 454 F.3d 24, 31 (1st Cir.2006). Specifically, a waiver of immunity by the Commonwealth can occur in three ways: "(1) by a clear declaration that it intends to submit itself to the jurisdiction of a federal court ...; (2) by consent to or participation in a federal program for which waiver of immunity is an express condition; or (3) by affirmative conduct in litigation." *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 33 (1st Cir.2006) *citing New Hampshire v. Ramsey*, 366 F.3d 1, 15 (1st Cir.2004).

The Rehabilitation Act, provides in relevant part the following:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. 29 U.S.C. § 794.

The Magistrate–Judge found that plaintiffs' allegation that the MBA (not the DTPW or the Commonwealth) receives federal funding but could only establish that the MBA waived its sovereign immunity, does not go so far as to compromise the DTPW's or the Commonwealth's immunity with respect to the claims under the Rehabilitation Act. Plaintiffs contest the basis for the Magistrate–Judge's conclusion: that they only assert that the MBA, not the DTPW or the Commonwealth, receives federal funding. Plaintiffs state that the Second Amended Complaint does allege that both the DTPW and the MBA receive federal funding from the United States Department of Transportation. Since the DTPW receives this funding, plaintiffs contend, it has waived its Eleventh Amendment immunity under the Rehabilitation Act. Further, plaintiffs argue that the DTPW has also waived its Eleventh Amendment immunity under the Rehabilitation Act because it receives funds which are allocated to the MBA's Call & Ride Program, and the MBA is a program or activity of the DTPW's.

The Court has reviewed the Second Amended Complaint and has found the allegation plaintiffs point to, corroborating that they do allege that both the MBA and the DTPW waived immunity by accepting funds from the U.S. Department of Transportation.[7] Accordingly, the Magistrate–Judge's finding to the contrary is mistaken.

We start with plaintiffs' uncontested allegation that the DTPW receives federal funds. The acceptance of federal funds by the DTPW operates as a waiver of Eleventh Amendment immunity from the claims under the Rehabilitation Act. *See* 42 U.S.C. § 2000d–7(a)(1); *Diaz–Fonseca,* 451 F.3d at 33; *Nieves–Marquez v. Puerto Rico,* 353 F.3d 108, 127–30 (1st Cir.2003). 42 U.S.C. § 2000d–7(a)(1) provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." This statutory provision was the basis for the First Circuit's holding in *Nieves–Marquez* that the Commonwealth of Puerto Rico waived any Eleventh Amendment immunity to a Rehabilitation Act claim based on violations to the Individuals with Disabilities Education Act ("IDEA") by accepting federal educational funding. Similarly, in *Diaz–Fonseca,* the First Circuit held that the Commonwealth defendants did not have Eleventh Amendment immunity against the federal IDEA and Rehabilitations Act claims because they had waived such immunity by accepting federal funds. Accordingly, the DTPW waived any possibility invoking the Commonwealth's Eleventh Amendment immunity by accepting federal funds. As such, plaintiffs' objection on this issue is sustained. DTPW does not enjoy Eleventh Amendment immunity under the Rehabilitation Act.

(2) *Section 1983 claims*

Regarding the recommendation to dismiss the 1983 and 1988[8] claims against the

---

7. The Court found the allegation on page 7, paragraph 12, of the Second Amended Complaint. Plaintiffs pointed to page 5, paragraph 12.

8. Section 1988 grants attorneys fees to a party prevailing in an action under, among other statutory provisions, section 1983.

MBA, plaintiffs sustain that contrary to what the Magistrate–Judge concluded, the MBA is a "person" under 1983 and 1988. Plaintiffs argue that this is so because the MBA is a subdivision of a state that is not covered by Eleventh Amendment immunity. They sustain that they have an actionable claim under section 1983 because the MBA violated the Equal Protection Clause of the Fourteenth Amendment.

In support of their allegations, plaintiffs cite *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in which the Supreme Court determined that local governments not covered by the state's Eleventh Amendment immunity are "persons" within the meaning of section 1983, and *Jinks v. Richland County*, 538 U.S. 456, 466, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003), in which our highest court determined that a political subdivision of a state is subject to the mandate of 28 U.S.C. § 1367(d), which tolls the statute of limitations of actions pending in federal court. Plaintiffs invite the court to read these two cases together and arrive at the conclusion that the MBA is a political subdivision of the Commonwealth not included within its Eleventh Amendment immunity and should therefore be "considered covered by sections 1983 and 1988, for violation of the plaintiff's [sic] constitutional rights."

Under section 1983, an aggrieved individual may sue persons who, acting under color of state law, abridge rights, immunities, or privileges created by the Constitution or laws of the United States. *See Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir. 1991). "It is settled beyond peradventure, however, that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action." *Johnson v. Rodriguez*, 943 F.2d 104, 108 (1st Cir.1991) (citations omitted). Additionally, an arm-of-state is an inappro-

priate defendant in a section 1983 lawsuit. *Id.*

The Magistrate–Judge's conclusion that the MBA is not a "person" within the meaning of section 1983, was based on the holding in *Nadal v. Puerto Rico Tourist Development Co.*, 399 F.Supp. 1222 (D.P.R.1975). In *Nadal,* the court held that the Puerto Rico Tourist Development Company, a public corporation and instrumentality of the Commonwealth of Puerto Rico, was not a "person" under section 1983. *See also Rosado Maysonet v. Solis,* 409 F.Supp. 576 (D.P.R.1975). *Nadal* was decided under the authority of *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which established that a municipal corporation is not a "person" under the meaning of section 1983. The Court in *Nadal* conceded that the *Monroe* doctrine had been "expressly held applicable not only to the states but also to many of their political subdivisions including counties, towns, townships, school districts, boards of education, housing authorities, police departments, municipally owned hospitals and state colleges." *Id.* at 1224. As such, *Nadal* held that since the Puerto Rico Tourist Development Company was created as a public corporation and instrumentality of the Commonwealth, it was not a person under section 1983. However, the holding in *Monroe* was overruled by *Monell,* where the Supreme Court held that municipalities and other local government units or political subdivisions of a state are "persons" under section 1983. Accordingly, *Monroe* is no longer good law in this matter and the holding in *Nadal* cannot be applied today. *See e.g., Ainsworth Aristocrat Intern. Pty. Ltd. v. Tourism Co. of Com. of Puerto,* 818 F.2d 1034, 1039 n. 24 (1st Cir.1987).

As plaintiffs correctly state, *Monell* established that municipalities and local government units not considered part of the

State for Eleventh Amendment purposes are "persons" subject to suit under section 1983. Specifically, the Court in *Monell* held that municipal corporations and similar government entities are "persons." *Monell*, 436 U.S. at 669, 98 S.Ct. 2018; see also *Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 376, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). *Monell* is premised upon the indications in the legislative history of section 1983 that local governments were meant to be within its reach. The boundaries of the holding in *Monell* "establish that the most important inquiry in determining whether a governmental entity is a 'person' within the meaning of § 1983 is whether the entity is an 'arm[ ] of the State' for Eleventh Amendment purposes" since arms of state are not persons for those purposes. *Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority*, 103 F.3d 1165, 1173 (3rd Cir. 1997) (citations omitted).

█ Applying the case law cited above to the case at hand leads the Court to conclude that the MBA is a "person" subject to suit under section 1983. First, we have already determined that the MBA is not cloaked by the Commonwealth's Eleventh Amendment immunity and is therefore not an arm of the state. This Court's analysis of whether the MBA enjoys Eleventh Amendment immunity, above, shows that the MBA is more akin to a municipal corporation than to an agency of the Commonwealth. Indeed, it was created as a public corporation or instrumentality of the Commonwealth, so it is clearly a political subdivision of the state. It is logical to conclude that the MBA is the kind of political subdivision *Monell* intended to make susceptible to suit under section 1983; it is not the type of structure meant to be excluded from section 1983's applicability.

### E. Unobjected Recommendations

In addition to the recommendations objected to by the MBA and plaintiffs, the Magistrate–Judge made the following recommendations, which were not objected by any party:

(1) that the Commonwealth's and DTPW's request for dismissal of the claims under Title II of ADA on Eleventh Amendment immunity grounds be DENIED;

(2) that the Commonwealth's request for dismissal of the claims under the Rehabilitation Act on Eleventh Amendment immunity grounds be GRANTED;

(3) that the Commonwealth's and DTPW's request for dismissal of all claims under Sections 1981 and/or 1981a, 1983, 1985 and 1988 be GRANTED;

(4) that the Commonwealth's and DTPW's request for dismissal of all claims under Commonwealth law on Eleventh Amendment immunity grounds be GRANTED;

(5) that the MBA's request for dismissal of all claims under Sections 1981 and/or 1981a and 1985 be GRANTED;

(6) that the MBA's request for dismissal of all claims under Commonwealth law be DENIED;

(7) that defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the claims asserted against them under ADA and the Rehabilitation Act in their individual capacity be GRANTED;

(8) that defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the Section 1983 claims for injunctive relief asserted against them in their official capacity be DENIED (unless the Court is willing to take judicial notice of the fact that Alcaraz–Emanuelli is not DTPW's Secretary at the present);

(9) that defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the Section 1983 monetary claims asserted against them in their official capacities be GRANTED;

(10) that defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the monetary Section 1983 claims asserted against them in their individual capacities on respondeat superior and qualified immunity grounds be DENIED; and

(11) that defendants' request for dismissal of the punitive damages be GRANTED with respect to ADA and the Rehabilitation Act, but DENIED with respect to Section 1983.

After reviewing the record, the Court agrees with the arguments, factual and legal conclusions regarding the above-listed unopposed recommendations, except for the one having to do with the section 1985 claims against the MBA. The Magistrate–Judge recommended the these claims be dismissed based on the rationale that the MBA is not a "person" under 1985. As he correctly stated, courts are in agreement that the analysis of the word "person" for purposes of section 1983 applies to the analysis of the word person for purposes of section 1985. See, e.g. *Santiago v. N.Y. St. Dept. Of Correctional Services*, 725 F.Supp. 780, 783–84 (S.D.N.Y.1989), rev'd on other grounds, 945 F.2d 25 (2d Cir. 1991). The Court has determined that the MBA is a "person" under section 1983. For the same reasons, the Court determines that the MBA is a "person" under section 1985. As such, the Court shall not dismiss the claims against the MBA under section 1985.

## CONCLUSION

For the foregoing reasons, the Court **ADOPTS in PART and REJECTS in PART** the Magistrate–Judge's Report and Recommendation. Accordingly, the Court rules as follows:

(1) the Commonwealth's and DTPW's request for dismissal of the claims under Title II of ADA on Eleventh Amendment immunity grounds is DENIED;

(2) the Commonwealth's request for dismissal of the claims under the Rehabilitation Act on Eleventh Amendment immunity grounds is GRANTED;

(3) the DTPW's request for dismissal of the claims under the Rehabilitation Act on Eleventh Amendment immunity grounds is DENIED;

(4) the Commonwealth's and DTPW's request for dismissal of all claims under Sections 1981 and/or 1981a, 1983, 1985 and 1988 is GRANTED;

(5) the Commonwealth's and DTPW's request for dismissal of all claims under Commonwealth law on Eleventh Amendment immunity grounds is GRANTED;

(6) The MBA's request for dismissal of all claims asserted in the Second Amended Complaint on Eleventh Amendment immunity grounds is DENIED;

(7) The MBA's request for dismissal of all claims under Sections 1981 and/or 1981a is GRANTED;

(8) The MBA's request for dismissal of all claims under Sections 1983, 1985 and 1988 is DENIED;

(9) The MBA's request for dismissal of all claims under Commonwealth law is DENIED;

(10) defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the claims asserted against them under ADA and the Rehabilitation Act in their individual capacity is GRANTED;

(11) that defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's re-

quest of dismissal of the Section 1983 claims for injunctive relief asserted against them in their official capacity is DENIED;

(12) defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the Section 1983 monetary claims asserted against them in their official capacities is GRANTED;

(13) defendants Alcaraz–Emanuelli's, Gonzalez–Baker's and Mirabal's request of dismissal of the monetary Section 1983 claims asserted against them in their individual capacities on *respondeat superior* and qualified immunity grounds is DENIED; and

(14) defendant's request for dismissal of the punitive damages is GRANTED with respect to ADA and the Rehabilitation Act, but DENIED with respect to Section 1983.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

MARCOS E. LÓPEZ, United States Magistrate Judge.

### I. PROCEDURAL BACKGROUND

The original Complaint in this case was filed on June 28, 2006. Docket No. 1. Amended Complaints were filed on July, 10 and November 14, 2006. Dockets No. 3, 23.[1] On January 23, 2007, plaintiffs Emilio Orria–Medina, Emilio R. Orria–Cruz, Agnes L. Repullo, Iliana Rivera Reyes, Violeta Albino, Alba Toro, Aileen G. Curas–Negrón, José J. Ocasio–Rodríguez, José M. NievesRíos, Wanda D. Díaz–Gómez and Vanessa Delgado–Rodríguez (collectively, "Plaintiffs"), filed a "Second Amended Complaint" pursuant to (1) the First, Fifth and/or Fourteenth Amendments to the U.S. Constitution, (2) Title II of the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12131–12165, (3) Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794, (4) the Civil Rights Remedies Equalization Act ("CRREA"), 42 U.S.C. § 2000d–7, (5) 42 U.S.C. §§ 1981a, 1983, 1985 and 1988 ("Sections 1981a, 1983, 1985 and 1988" respectively) and (6) several provisions of the Code of Federal Regulations against: (1) the Metropolitan Bus Authority ("AMA" for its Spanish acronym); (2) the Puerto Rico Department of Transportation and Public Works ("DTOP" for its Spanish acronym); (3) the Commonwealth of Puerto Rico ("Commonwealth"); (4) Mr. Gabriel Alcaraz–Emanuelli ("Alcaraz–Emanuelli"), in his official capacity as Secretary of the DTOP and in his personal capacity, his spouse "X" and the conjugal legal partnership constituted between them; (5) Ms. Adaline Torres–Santiago ("Torres–Santiago"), in her personal capacity only; (6) Mr. Evans González–Baker ("González–Baker") in his official capacity as President of the AMA and in his personal capacity, his spouse "Y" and the conjugal legal partnership constituted between them; (7) Mr. Manuel Mirabal ("Mirabal") in his official capacity as Administrator of the "Llame y Viaje" ("Call & Ride") program of the AMA and in his personal capacity, his spouse "Z" and the conjugal legal partnership constituted between them; and (8) John Doe, Jane Roe, and insurance companies A, B, C, D & E (collectively, "Defendants"). The Second Amended Complaint also alleges violations under the laws of the Commonwealth of Puerto Rico, to wit: Article II, Sections 1, 4, 6–8 and 16 of the Constitution of the Commonwealth of Puerto Rico, the Bill of Rights for Persons with Disabilities, P.R. Laws. Ann. tit. 1, §§ 512(a)–512(k), the Uniform Administra-

---

**1.** On December 13, 2006, Plaintiffs filed another Amended Complaint. Dockets No. 31, 32. Pursuant to the Order issued by the Court on January, 18, 2007, this Amended Complaint was stricken from the record. Docket No. 44.

tive Procedures Act ("UAPA"), P.R. Laws. Ann. tit. 3, §§ 2101–2201, the Uniform Rate Revision and Modification Act ("URRMA"), P.R. Laws. Ann. tit. 27, §§ 261–261(e) and tort claims under article 1802 of the P.R. Civil Code, P.R. Laws Ann. tit. 31, § 3151. Docket No. 45.[2] Plaintiffs request through the Second Amended Complaint compensation for the economical, emotional and moral damages, punitive damages and injunctive relief from certain actions performed by Defendants as described below.

On October 2, 2006, co-defendants AMA, González–Baker, Mirabal and the Commonwealth filed a Motion to Dismiss alleging that: (1) co-defendants AMA, the Commonwealth and the individual defendants in their official capacities are entitled to Eleventh Amendment immunity with respect to the claims asserted against them under the laws of Puerto Rico; (2) the monetary claims under 42 U.S.C. § 1983 ("Section 1983") against the Commonwealth, AMA and the individual defendants in their official capacities must be dismissed because none of them are "persons" within the meaning of Section 1983; (3) the claims under ADA and the Rehabilitation Act against the individual defendants must be dismissed because no personal liability can attach under either of the two statutes; (4) monetary claims under Section 1983 against defendants in their individual capacities must be dismissed because no supervisory liability ex-

ists under Section 1983 and because they are entitled to qualified immunity; and (5) the claims for punitive damages must be dismissed because punitive damages are unavailable under ADA and the Rehabilitation Act. Docket No. 9. On October 13, 2006, co-defendants DTOP and Alcaraz–Emanuelli requested leave to join the Motion to Dismiss filed by the Commonwealth, AMA, González–Baker and Mirabal, which the Court granted that same day. Dockets No. 18, 20. On April 4, 2007, co-defendant AMA filed another Motion to Dismiss (Docket No. 58), supported by a Memorandum of Law (Docket No. 59) (hereinafter referred together as "AMA's Motion to Dismiss"), reiterating its claim of entitlement to Eleventh Amendment Immunity and adding as an additional ground for dismissal of the Second Amended Complaint that the same fails to state claims upon which relief can be granted.

On April 30, 2007, Plaintiffs filed a Response in Opposition to Motion to Dismiss ("Opposition") requesting that AMA's Motion to Dismiss be denied on several grounds, namely that: (1) the Second Amended Complaint alleges violations to Plaintiff's rights under Title II of ADA; and (2) AMA is not entitled to Eleventh Amendment Immunity because it is not an arm of the state and, even if it were, the U.S. Congress abrogated such immunity when enacting Title II of ADA. Docket No. 73.[3]

2. The Second Amended Complaint is, in reality, Plaintiffs' fourth amended complaint. *See* Dockets No. 3, 23, 31. Furthermore, on April 3, 2007, Plaintiffs once again requested leave to amend the complaint, arguing that such amendment was necessary in order to "address various modifications in the applicable statutes that our constant review of the case has determined as necessary to clarify the court's authority to hear the instant case" and "to include additional facts that justify this action." Docket No. 56. On April 18, 2007,

this Court denied the requested leave. Docket No. 66. In doing so, this Court noted that the amendments that Plaintiffs have requested and the Court has granted since the inception of this case in the summer of 2006, have provided Plaintiffs with ample opportunities to amend the Complaint for the purposes stated by Plaintiffs. Docket No. 66.

3. In the Opposition, Plaintiffs states that AMA's Motion to Dismiss should be stricken from the record because the length of the Memorandum of Law (Docket No. 59) ex-

Pursuant to the Referral Order issued by the Court on April 5, 2007 (Docket No. 62), all pending motions in this case were referred to the undersigned for disposition or for a Report and Recommendation, where appropriate. Accordingly, the undersigned Magistrate Judge submits this Report and Recommendation on the Motion to Dismiss, the Motion to Join Motion to Dismiss and AMA's Motion to Dismiss. Dockets No. 9, 18, 58, 59.

## II. FACTUAL BACKGROUND

This suit involves the Call and Ride program administered by AMA. AMA is a public corporation and instrumentality of the Commonwealth of Puerto Rico created by the Metropolitan Bus Authority Act, Act No. 5 of May 11, 1959, as amended. P.R. Laws Ann. tit. 23, §§ 601–620 ("AMA's Enabling Act"). AMA's primary goal is to provide, develop, maintain and administer a public mass transportation system to residents and visitors of the San Juan Metropolitan area. P.R. Laws Ann. tit. 23, § 606. As part of its services, AMA created the Call and Ride program to provide paratransit transportation services to persons with physical and/or mental disabilities that are not able to benefit from AMA's regular services. Users must be subscribed to the Call and Ride pro-

ceeds the maximum allowed by the Local Rules of this Court and, therefore, AMA should have requested leave to file said Memorandum. Plaintiffs also state that, to support their contention that the AMA is entitled to Eleventh Amendment Immunity, AMA attached several exhibits to its Memorandum of Law, converting AMA's Motion to Dismiss into a Motion for Summary Judgment under Federal Rule 56 of Civil Procedure. Plaintiffs assert that AMA wants its sovereign immunity defense to be ruled upon early in this litigation but that, in order to effectively oppose the immunity defense, Plaintiffs would need to be allowed to conduct discovery on this matter. Plaintiffs, thus, argue that they should not be required to oppose the motion for summary judgment until they have conducted said discovery. Docket No. 73, pages 1–3.

AMA's Memorandum of Law (Docket 59) is twenty-six (26) pages in length, which barely exceeds the twenty-five (25) page limit set forth in Local Rule 7.1(e). Under this circumstances, this Court will accept said memorandum despite the fact that the AMA did not requested leave to file it as required by Local Rule 7.1(e). The Court, however, warns the parties that they must strictly comply with the Federal and Local Rules of Civil Procedure.

As to the issue of the conversion of the Motion to Dismiss into a Motion for Summary Judgment, Federal Rule 12(b) of Civil Procedure provides that a motion to dismiss for failure to state a claim upon which relief can be granted shall be converted into a motion for summary judgment whenever matters outside the pleadings are presented to an relied by the district court. *See Greene v. Rhode Island*, 398 F.3d 45, 48 (1st Cir.2005). However, "[a] motion to dismiss is not automatically transformed into a motion for summary judgment simply because matters outside the pleadings are filed with, and not expressly rejected by, the district court. If the district court chooses to ignore the supplementary materials and determines the motion under the Rule 12(b)(6) standard, no conversion occurs." *Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B.*, 958 F.2d 15, 18 (1st Cir.1992). Thus, in determining whether the submission of exhibits with a motion to dismiss converts it into a motion for summary judgment, "the test is not whether or not supplementary materials were filed, but whether the court actually took cognizance of them, or invoked Rule 56, in arriving at its decision." *Id.* Furthermore, "conversion of a Rule 12(b)(6) motion into a Rule 56 motion is a matter quintessentially within the purview of the district court's sound discretion." *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998). In this case, this Court understands that it is not necessary to take cognizance of or make reference to the exhibits attached to AMA's Motion to Dismiss, or invoke the Rule 56 standard, in order to evaluate AMA's Motions to Dismiss. Dockets No. 58, 59. Therefore, in the exercise of its discretion, this Court will not convert AMA's Motion to Dismiss into a Motion for Summary Judgment.

gram and make reservations in order to receive transportation services from said program. All Plaintiffs in this case claim to be participants and regular users of the Call and Ride program. Docket No. 45, ¶ 6.

According to the Second Amended Complaint, until June 2005, the rates for the Call and Ride services had been held constant at around $0.50 cents per trip per customer, up to a maximum of $1.50. These rates were twice the rates paid by users of the "regular" bus service. But on or around June, 2005, AMA determined to revise its tariff schedule for all its services, including the Call and Ride program. Docket No. 45, ¶¶ 13, 14.

AMA published advertisements announcing the holding of public hearings with the purpose of revising AMA's tariff system, without making a specific indication that the rates for the Call and Ride program were going to be revised as well. In particular, Plaintiffs claim that AMA did not specifically inform the users of the Call and Ride program that it was considering raising the rates, and that a reasonable person would have thought, based on the announcements, that only the rates for AMA's regular routes, not the Call and Ride program's rates, would be revised. These actions, Plaintiffs assert, constitute a violation of the procedures set forth by 49 C.F.R. § 37.137(c), the UAPA, the URRMA and the Bill of Rights for Persons with Disabilities, inasmuch the notices of the public hearings on the proposed rate increase were not specific enough and did not allow those affected by the increase to become aware that any opposition to the raise had to be presented at said hearings. Docket No. 45, ¶¶ 15–20.

On November 10, 2005, co-defendant Torres–Santiago, then AMA's president, mailed a letter to the users of the Call and Ride program informing that on Novem-

ber 16, 2005, the rates for the program would be increased. Plaintiffs claim that this notification was defective, as any change in the program has to be notified no less than 10 days before of the scheduled date of implementation of such change and that, even if the rate increase had been properly authorized, the same could not become effective until November 20, 2005, at the earliest. *Id.*, ¶¶ 22–23.

After users of the Call and Ride program became aware of the proposed increase, they began to publicly complain about the decision. As a result of said complaints, the Puerto Rico House of Representatives' Committee on Consumer Affairs ("Committee") decided to hold public hearings between mid-December of 2005 and February 2006 on how the rate had been increased and on whether the proceedings for raising the rates were conducted in compliance to the law. The Committee scheduled hearings for December 7, 2005, and its chairman, Representative Jorge Navarro–Suárez, publicly announced the holding of hearings to investigate the matter. *Id.*, ¶¶ 24–25.

Several users of the Call and Ride program, including co-plaintiff Emilio Orria–Medina, upon learning of the hearing, called to make reservations so they would be transported to the Capitol in San Juan to participate in the hearings, instead of their usual routes. The reservations were entered in the system normally. However, around December 6, 2005, Torres–Santiago became aware that many users of the program wanted to attend the hearings held by the Committee to complain about the rate increase, as well as about other problems and alleged abuses. Plaintiffs assert that Torres–Santiago became enraged at the prospect of clients of the Call and Ride program complaining about the irregular way in which the rate was increased, about the lack of compliance with the require-

ments for a rate increase, and about other problems confronted by the program. Furthermore, Plaintiffs allege that Torres–Santiago was well aware of who these clients were since she had personally met with some of them and that she was aware of their complaints. Plaintiffs not only wanted to complain about the rate increase, but also about the routinary mistreatment they are subjected to, including rude comments by bus drivers, bus drivers of the regular service who do not want to activate ramps for users who need them to enter the buses, and other types of verbal and psychological abuse. *Id.,* ¶¶ 26–28.

Plaintiffs claim that in order to minimize criticism of the Call and Ride program and avoid Plaintiffs' participation in the hearings, Torres–Santiago pressured then-director of the program, Mrs. Maria Cordero–Rodríguez, to make those reservations "disappear." Torres–Santiago specifically indicated that she did not want those customers to attend the hearing to express their complaints. Torres–Santiago allegedly told Ms. Cordero–Rodríguez something like "these [people] want to speak badly about us and they expect us to transport them there." Plaintiffs also state that co-defendant Mirabal, who was the administrator of the Call and Ride program, actively participated in this scheme. Plaintiffs claim that Torres–Santiago's actions constitute an infringement of their First Amendment rights and a direct violation to 49 C.F.R. § 31.131(d), which prohibits the imposition of restrictions or priorities based on the purpose of the trip. According to the Second Amended Complaint, Torres–Santiago imposed the cancellation of the trips solely because of the purpose of the customers to complain about the program. Plaintiffs further assert that Torres–Santiago invited other users of the Call and Ride program to attend the hearings to testify favorably about AMA and ordered arrangements to be made to provide them transportation to said hearings. Docket No. 45, ¶¶ 29–31. Plaintiffs also allege that Alcaraz–Emanuelli was aware of Torres–Santiago's scheme and that he did not take any action on the matter until the situation became public.

Furthermore, the Second Amended Complaint states that AMA officials have diverted buses from the Call and Ride program to official and/or political activities, such as the 2003 and 2004 celebrations of the Commonwealth Constitution. Some buses assigned to the Call and Ride program were used to transport people without physical limitations to those activities, which were held in areas outside the coverage areas of the program. To cover up the illegal use of the buses, Plaintiffs claim that the drivers were ordered not to report the use given to the buses on those days. *Id.,* ¶¶ 35–37, 47.

Plaintiffs request through the Second Amended Complaint that the rate increase be declared null and void as it was illegally approved and implemented by AMA. *Id.,* ¶¶ 16–23. Plaintiffs also assert that Defendants' actions resulted in "economic, emotional and moral" damages to all Plaintiffs. They claim to have experienced "great distress and anxiety, thinking that the defendants can attempt to take advantage of their disadvantaged position to retaliate against them for their vocal criticism of what they genuinely feel are deficiencies in the Call [and] Ride program." *Id.,* ¶ 48. In particular, Plaintiffs claim to have suffered dire economical consequences from the rate increase. Therefore, Plaintiffs claim to be entitled to reimbursement for the moneys they have been paying and continue paying daily since the allegedly illegal increase went into effect. Plaintiffs estimate this amount "at much more than $100,000.00 per user of the program." *Id.,* ¶¶ 49–50.

Plaintiffs also request compensation in the amount at least $500,000.00 per user of the program for the moral damages they claim to have suffered, including anxiety, depression, continuous fear, insomnia and post-traumatic stress disorder and damages to their self esteem. *Id.,* ¶¶ 51–52. Plaintiffs further request punitive damages in the amount of at least $1,000,000.00 per defendant, in light of the "seriousness of the situation, and to set an example so that abuses like this against our most vulnerable citizens don't happen again." Plaintiffs request as well that in the case of the individual defendants punitive damages be paid out of their own resources and not from the resources of the people of Puerto Rico. *Id.,* ¶ 53. Finally, Plaintiffs request the Court to prohibit AMA (1) from taking reprisals against Plaintiffs and the users of the program, and (2) from charging the increased rates until this Court determines if the process for its increase was done in compliance with applicable federal and state laws and regulations. It is also requested that AMA, its officers, agents drivers and employees be enjoined (1) from mistreating Plaintiffs and (2) from mistreating disabled persons who wish to travel in the "regular" buses and require their assistance. *Id.,* ¶ 55.

### III. MOTION TO DISMISS STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the Court must limit its focus to the allegations of the complaint. *Litton Indus., Inc. v. Colon,* 587 F.2d 70, 74 (1st Cir.1978). Specifically, the inquiry should be "whether a liberal reading of [the complaint] can reasonably admit of a claim ..." *Id.*

An evaluation of the merits of a motion to dismiss under Rule 12(b)(6) requires the Court to accept as true all well-pleaded factual claims and indulge all reasonable inferences in Plaintiff's favor. *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 190 (1st Cir. 1996). Dismissal under Rule 12(b)(6) is appropriate if the facts alleged, taken as true, do not justify recovery. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). Thus, a dismissal for failure to state a claim can only be upheld if, after giving credence to all well pleaded facts and making all reasonable inferences in the plaintiff's favor, the factual averments do not justify recovery on some theory asserted in the complaint. *Rogan v. Menino,* 175 F.3d 75, 77 (1st Cir.1999).

In order to survive a motion to dismiss, Plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988). Although all inferences must be made in Plaintiff's favor, the Court need not accept "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Aulson,* 83 F.3d at 3.

### IV. LEGAL ANALYSIS

#### 1. Dismissal of Claims against the Commonwealth and DTOP

The Commonwealth and DTOP request dismissal of the pendent state law claims on Eleventh Amendment immunity grounds. Both entities claim that they are entitled to Eleventh Amendment immunity protection regarding the causes of action under the laws of Puerto Rico even if they waived sovereign immunity protection with respect to the claims asserted under Title II of ADA or the Rehabilitation Act by accepting federal funds. The Commonwealth and DTOP seem to implicitly claim as well entitlement to Eleventh Amendment immunity as to the claims brought

under Title II of ADA and the Rehabilitation Act. Docket No. 9, pages 3–4.

### A. Claims under Title II of ADA.

The Eleventh Amendment to the U.S. Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." 1 U.S. Const. amend. XI. Furthermore, the Supreme Court of the United States repeatedly has held that the Eleventh Amendment bars suits against a state by its own citizens. *E.g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Missouri v. Fiske*, 290 U.S. 18, 28, 54 S.Ct. 18, 78 L.Ed. 145 (1933).

■ The Eleventh Amendment bars suits from being brought in federal courts for monetary damages against states, unless the state being sued waives its immunity or consents to being sued. Even though the Commonwealth of Puerto Rico is not a state, it enjoys the protection of the Eleventh Amendment. *Jusino Merca-do v. Commonwealth of Puerto Rico*, 214 F.3d 34, 37 (1st Cir.2000).[4] In general terms, the Commonwealth of Puerto Rico and its dependencies have not waived their immunity under the Eleventh Amendment to be sued for damages in federal court, *Figueroa–Rodriguez v. Aquino*, 863 F.2d 1037, 1045 (1st Cir.1985); P.R. Laws Ann. tit. 32, § 3077. Thus, because the Commonwealth and DTOP enjoy sovereign immunity,[5] the Court must evaluate whether they have waived their immunity with respect to the Title II ADA claims.

Congress enacted Title II of the ADA to combat discrimination by governmental entities in the operation of public services, programs, and activities. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute authorizes private suits against public entities to enforce its provisions. *See* 42 U.S.C. § 12133. Moreover, Title II of the ADA provides that "[a] State shall not be immune under the [E]leventh [A]mendment

---

**4.** Over the last two decades the First Circuit consistently has held that Puerto Rico is considered a "State" for Eleventh Amendment purposes, and therefore Eleventh Amendment applies with full force to the Commonwealth of Puerto Rico. *See, e.g., Ortiz Feliciano v. Toledo Davila*, 175 F.3d 37, 39 (1st Cir.1999); *Negron Gaztambide v. Hernandez Torres*, 145 F.3d 410 (1st Cir.1998); *Futura Development v. Estado Libre Asociado*, 144 F.3d 7, 12–13 (1st Cir.1998); *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Authority*, 991 F.2d 935, 939 n. 3 (1st Cir.1993); *Aviles–Martinez v. Monroig*, 963 F.2d 2, 8 (1st Cir.1992); *De Leon Lopez v. Corporacion Insular de Seguros*, 931 F.2d 116, 121 (1st Cir.1991); *Puerto Rico Ports Auth. v. M/V Manhattan Prince*, 897 F.2d 1, 9 (1st Cir.1990); *Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506, 516 (1st Cir. 1987); *Ainsworth Aristocrat International Pty., Ltd. v. Tourism Co. of P.R.*, 818 F.2d 1034 (1st Cir.1987); *Fernandez v. Chardon*, 681 F.2d 42, 59 n. 13 (1st Cir.1982) (Puerto Rico enjoys the full benefits of the Eleventh Amendment); *Ezratty v. Com. of Puerto Rico*, 648 F.2d 770, 776 n. 7 (1st Cir.1981) ("The principles of the Eleventh Amendment, which protects a state from suit without its consent, are fully applicable to the Commonwealth of Puerto Rico."); *Litton Indus., Inc. v. Colon*, 587 F.2d 70 (1st Cir.1978) (action against Puerto Rico barred by Eleventh Amendment, unless immunity is expressly abrogated by Congress acting under the Fourteenth Amendment).

**5.** *See Bernier–Aponte v. Izquierdo–Encarnacion*, 196 F.Supp.2d 93, 99–101 (D.P.R.2002) (DTOP is an arm of the Commonwealth entitled to Eleventh Amendment immunity); *see also Ramos–Piñero v. Puerto Rico*, 453 F.3d 48, 52 (1st Cir.2006).

to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.

■ The Eleventh Amendment immunity is not absolute and may be waived by the state or "stripped away" by Congress. *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Authority*, 991 F.2d 935, 938 (1st Cir.1993). There are four (4) circumstances in which the Eleventh Amendment protection unravels: (1) when a state consents to be sued in a federal forum; (2) when a state waives its own immunity by statute or the like; (3) when Congress abrogates state immunity; and (4) when, provided that circumstances allow, other constitutional imperatives take precedence over the Eleventh Amendment's protection. *Id.*, at 938 (citations omitted). *See Toledo v. Sanchez*, 454 F.3d 24, 31 (1st Cir.2006).

■ Congress' abrogation of state immunity is valid so long as its intention of doing so is made unmistakably clear in the language of the statute and Congress acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to the U.S. Constitution. *See Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 726, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003)

Based on recent Supreme Court case law, the First Circuit has explained that, with respect to Title II of ADA, Congress met the first requirement of unequivocally expressing its intent to abrogate state sovereign immunity. *See Tennessee v. Lane*, 541 U.S. 509, 518, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (citing 42 U.S.C. § 12202). As to the second requirement, the Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity as to (1) state conduct that actually violates the Constitution, *United States v. Georgia*, 546 U.S. 151, 160, 126 S.Ct. 877, 882, 163 L.Ed.2d 650 (2006), and (2) some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to "prevent and deter unconstitutional conduct." *Lane*, 541 U.S. at 518, 529. *See Toledo*, 454 F.3d at 31.

Plaintiffs in this case claim that Defendants violated their First Amendment rights when Defendants cancelled the reservations Plaintiffs had made with the Call and Ride program to be transported to the Capitol to attend the public hearings. Plaintiffs allege that the cancellations were based on the content of what they wanted to testify before the Committee, which included not only complaints about the rate increase, but also complaints about allegedly deficient service provided by the Call and Ride program and the routinary mistreatment and abuses that Plaintiffs claim to have suffered. As an example of the violation to their First Amendment rights, Plaintiffs assert that codefendant Torres–Santiago, referring to them, allegedly expressed that "these [people] want to speak badly about us and they expect us to transport them there." Docket No. 45, ¶¶ 27–30, 46.

■ Plaintiffs essentially allege that Defendants' actions amount to prior restraint or censorship to the content of Plaintiffs' testimony before the Committee. Although prior restraint is not unconstitutional per se, it bears a heavy presumption against its constitutional validity. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The Supreme Court has held that: (1) "a system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system"; (2) "because only a judi-

cial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint"; and (3) "the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor ... and ... any restraint prior to judicial review can be imposed only for a specified brief period ... only for the purpose of preserving the status quo ... and ... a prompt final judicial determination must be assured." *Id.*, at 558–60.

This Court finds that the allegations of the Second Amended Complaint, if true, squarely implicate Plaintiffs' First Amendment right to freedom of expression. Defendants' alleged conduct in cancelling Plaintiffs' reservations based on the content of their speech carries with it a presumption of unconstitutionality. Furthermore, with the allegations presented so far, the Court is in no position to determine whether procedural safeguards were observed when Defendants allegedly engaged in such conduct.

The Commonwealth and DTOP are not entitled to sovereign immunity insofar the Second Amended Complaint alleges claims that, if true, constitute actual violations of the U.S. Constitution, namely, freedom of expression.[6] *Lane*, 541 U.S. at 518, 529; *Toledo*, 454 F.3d at 31. It is therefore recommended that the request for dismissal of the claims asserted under ADA against the Commonwealth and DTOP on sovereign immunity grounds be DENIED.

**B. Claims under the Rehabilitation Act.**

In the Second Amended Complaint, Plaintiffs also bring claims under the Re-

habilitation Act, which provides, in relevant part, that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794.

The First Circuit has held that the Commonwealth's or one of its agencies' acceptance of federal funds operates as a waiver of Eleventh Amendment immunity protection against claims brought under the Rehabilitation Act. *See* 42 U.S.C.A. § 2000d–7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of Section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794] ..."); *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 33 (1st Cir.2006); *Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 127–30 (1st Cir.2003) (since the Department of Education voluntarily receives millions of dollars in federal funding, it effectively waived any Eleventh Amendment immunity as to Rehabilitation Act claims). This waiver of immunity, however, is limited and applies only to the particular agency or department that receives the federal funds. *Id.*, at 128–129; *see also Doe v. Nebraska*, 345 F.3d 593, 598 (8th Cir.2003) (waiver of sovereign immunity is limited and applies only to the individual agency that receives the federal funds; a state can avoid waiver by accepting federal funds for some departments and declining them for others); *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d

---

**6.** This does not necessarily mean that the Second Amended Complaint does not state plausible claims of other constitutional violations.

161, 171 (3rd Cir.2002) ("Therefore, if a state accepts federal funds for a specific department or agency, it voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency-but only against that department or agency."); *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir.2000).

In this case, Plaintiffs assert that AMA, not DTOP or the Commonwealth, receives federal funds from the U.S. Department of Transportation to fund part of its operations. Docket No. 45, ¶ 11. Even if true, these allegations could only establish that AMA waived its sovereign immunity, if any, with regard to the Rehabilitation Act claims. Hence, the Court cannot conclude that AMA's acceptance of such funds compromises the Commonwealth's and DTOP's sovereign immunity with respect to those claims. It is therefore recommended that the request for dismissal of the claims asserted under the Rehabilitation Act against the Commonwealth and DTOP on sovereign immunity grounds be GRANTED.

### C. Claims under 42 U.S.C. § 1981(a) ("Section 1981") and Sections 1981a, 1983, 1985, 1988.

Besides the claims under ADA and the Rehabilitation Act, Plaintiffs also assert claims under Sections 1981a, 1983, 1985 and 1988 against the Commonwealth and DTOP. The Commonwealth and DTOP request dismissal of the monetary claims asserted against them under Section 1983 alleging that they are not "persons" within the meaning of Section 1983. Although this request is limited only to the Section 1983 claims, this Court will also include the

Section 1981, 1981a, 1985 and 1988 in its analysis.

### 1. Dismissal of claims under Section 1981 and/or 1981a.

Plaintiffs state that claims are being brought under Section 1981 because they have suffered damages as a result of intentional discrimination due to their disabilities and because that section allows the award of punitive damages under various statutes, including the ADA. Docket No. 45, page 3, ¶ C.[7] However, after considering these assertions, the Court believes Plaintiffs' reference to Section 1981 is mistaken and that Plaintiffs intended to bring claims under Section *1981a* instead. In any event, such claims must be dismissed. Section 1981 and Section 1981a are different and Plaintiffs have made no valid claim under either of them.

Section 1981(a), which prohibits racial discrimination in the making and enforcement of contracts and property transactions, provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

"Section 1981 derives from the Civil Rights Act of 1866 and was intended 'to eradicate all discrimination against blacks and to secure for them full freedom and equality in civil rights.' *Mahone v. Wad-*

---

7. As will be discussed later, Plaintiffs are not entitled to punitive damages under Title II of ADA and the Rehabilitation Act. *See Barnes v. Gorman,* 536 U.S. 181, 189, 122 S.Ct. 2097,

153 L.Ed.2d 230 (2002); *Diaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 27, 29 (1st Cir. 2006).

*dle,* 564 F.2d 1018 (3rd Cir.1977). Racial animus is a necessary element of a claim under this section." *Springer v. Seaman,* 821 F.2d 871, 880 (1st Cir.1987) (emphasis in original), abrogated on other grounds by *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1992); *see also Runyon v. McCrary,* 427 U.S. 160, 168–70 & n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

Section 1981 is directed solely at discrimination based on race. *See Danco, Inc. v. Wal–Mart Stores, Inc.,* 178 F.3d 8, 13 (1st Cir.1999) ("[S]ection 1981 protects only certain specified rights, including the right to make and enforce contracts, and it protects them only against racial discrimination."). "Insofar as it deals with contracts, section 1981 'declares the personal right to make and enforce contracts, a right, as the section has been construed, that may not be interfered with on racial grounds. The provision asserts, in effect, that competence and capacity to contract shall not depend upon race.' " *See Lopez–Rosario v. Police Dept.,* 126 F.Supp.2d 167, 174 (D.P.R.2000).

■■■ To establish a right to relief under Section 1981, a plaintiff must show (1) that he/she belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in Section 1981, including the right to make and enforce contracts. *Garrett v. Tandy Corp.,* 295 F.3d 94 (1st Cir. 2002).

A review of the Second Amended Complaint reveals it contains absolutely no allegations of racial discrimination nor does it refer to any act of racial discrimination by any of the Defendants. Moreover, at no point in the Second Amended Complaint

can a cause of action under Section 1981 be discerned. Assuming that Plaintiffs intended to bring claims under Section 1981, such claims must be dismissed because the Second Amended Complaint fails to state a cause of action upon which relief may be granted pursuant to Section 1981.

If, on the other hand, Plaintiffs' claims in the Second Amended Complaint are being brought under Section 1981a, such claims must also be dismissed. Section 1981a is titled "Damages in cases of intentional discrimination in employment" and provides in part as follows:

(a) Right of recovery

(1) Civil rights

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C.A. §§ 2000e–5 or 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C.A. §§ 2000e–2, 2000e–3, or 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

(2) Disability

In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C.A. §§ 2000e–5 or 2000e–16] (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)),

and section 794a(a)(1) of Title 29, respectively) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under section 791 of Title 29 and the regulations implementing section 791 of Title 29, or who violated the requirements of section 791 of Title 29 or the regulations implementing section 791 of Title 29 concerning the provision of a reasonable accommodation, or section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act, against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

(3) Reasonable accommodation and good faith effort

In cases where a discriminatory practice involves the provision of a reasonable accommodation pursuant to section 102(b)(5) of the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12112(b)(5)] or regulations implementing section 791 of Title 29, damages may not be awarded under this section where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

(b) Compensatory and punitive damages

(1) Determination of punitive damages

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

(2) Exclusions from compensatory damages

Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e–5(g)]. . . .

42 U.S.C. § 1981a.

A brief reading of Section 1981a reveals, as its title suggests, that its purpose is to allow recovery of damages in cases in which a complaining party alleges violations to Title I of the ADA due to intentional discrimination in *employment* based on her or his disability. Therefore, Section 1981a does not apply to this case, in which Plaintiffs claim violations to Title II of ADA. *See, e.g.,* Mary L. Topliff, Annotation, *Remedies available under Americans with Disabilities Act,* 136 A.L.R. Fed 63, § 2(a). ("Punitive damages are not available under Title II of the ADA by virtue of the provisions of the Civil Rights Act of 1991 (42 U.S.C.A. § 1981a), which expressly amended only Title I of the ADA by providing for awards of compensatory and punitive damages, thus counseling against any statutory construction that punitive damages are available by inference with respect to Title II.").

A review of the Second Amended Complaint reveals it contains absolutely no alle-

gations of employment discrimination against Plaintiffs nor does it refer to any fact suggesting that Plaintiffs were Defendants' employees. Therefore, assuming that Plaintiffs intended to bring claims under Section 1981a, such claims must be dismissed because the Second Amended Complaint fails to state a cause of action upon which relief may be granted pursuant to Section 1981a. It is recommended that all claims under Section 1981 or 1981a against all the Defendants be DISMISSED.

### 2. Dismissal of claims under Section 1983, 1985 and 1988.

A state and its agencies are not "persons" within the meaning of Section 1983. *Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Brown v. Newberger,* 291 F.3d 89 (1st Cir.2002). Therefore, Plaintiffs' Section 1983 claims against the Commonwealth and DTOP must fail. As to the Section 1985 claims, it has been stated that although the Supreme Court has not decided the issue, courts are in agreement that analysis of the word "person" for purposes of Section 1983 applies equally to use of the word "person" in Section 1985. *See, e.g., Santiago v. N.Y. St. Dept. of Correctional Services.,* 725 F.Supp. 780, 783–84 (S.D.N.Y.1989) (explaining "principle that 'under [Sections] 1983 and 1985[,] the term 'persons' has the same meaning' " and concluding that state agency was not a "person" under Section 1985), rev'd on other grounds, 945 F.2d 25 (2d Cir.1991).

Moreover, Plaintiffs' Section 1983, 1985 and 1988 claims must also fail because both the Commonwealth and DTOP are immunized by the Eleventh Amendment against such claims. This Court has held that the Commonwealth's immunity has not been waived or abrogated under Sec-

tions 1983, 1985 and 1988. *See e.g., Aguilar–Moya v. Puerto Rico,* No. 06–1513, 2006 WL 3000765 at *2. (D.P.R. Oct.19, 2006) (plaintiff could not sue the Puerto Rico Police Department or the Commonwealth of Puerto Rico for money damages under Sections 1981, 1983, 1985, 1986 and 1988 because the Commonwealth's immunity has not been waived or abrogated under those sections). It is therefore recommended that the monetary claims asserted against the Commonwealth and DTOP pursuant to Sections 1983, 1985 and 1988 be DISMISSED.

### D. Claims under Commonwealth law.

The Commonwealth and DTOP allege that even if they waived Eleventh Amendment immunity from monetary liability as to ADA and Rehabilitation Act claims by AMA's acceptance of federal funds, they did not waive said immunity as to pendent state law claims being heard in federal court. In particular, the Commonwealth and DTOP assert they did not waive their immunity from suit in federal court on the pendent state law claims under the Constitution of the Commonwealth, the Bill of Rights for Persons with Disabilities, the UAPA, or article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141. Docket No. 9, pages 3–4. Plaintiffs have not presented any argument against this request for dismissal of the pendent state claims against the Commonwealth.

In *Diaz–Fonseca v. Puerto Rico,* 451 F.3d 13 (1st Cir.2006), the First Circuit stated that "the Commonwealth's 'waiver of sovereign immunity in its own courts is not a waiver of Eleventh Amendment immunity in the federal courts.' " *Id.,* at 33 (*quoting Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99 n. 9, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)); *see also Rodriguez Santana v. Commonwealth of Puerto*

*Rico,* No. 06–1490, 2007 WL 981745, at *3 (D.P.R. March 26, 2007).

As to the claims under article 1802, the First Circuit explained that the Commonwealth enjoys sovereign immunity in this federal court. The Court stated that:

> [a]lthough the Commonwealth has consented to be sued for damages in actions brought under the Commonwealth general negligence statute, such consent does not extend to actions filed in any courts but the Commonwealth's own. Neither Section 1802 or 1803 contains an explicit waiver of the Commonwealth's sovereign immunity. And Law 104, P.R. Laws Ann. tit. 32, § 3077, which abrogates the Commonwealth's immunity with respect to negligence suits filed against the Commonwealth in Puerto Rico's Court of the First Instance, does not extend that waiver to suits filed in federal court. *See Pennhurst,* 465 U.S. at 99 & n. 9, 104 S.Ct. 900, 79 L.Ed.2d 67 (noting that "[a] State's constitutional interest in immunity encompasses not merely whether it may be sued, but *where* it may be sued").

*Diaz–Fonseca,* 451 F.3d at 33 (emphasis in the original). Moreover, a review of UAPA and the Bill of Rights for Persons with Disabilities does not suggest that the Commonwealth consented or intended to consent to being sued in the federal forum for the alleged violations of such statutes. Furthermore, there is no indication either that the Commonwealth has consented or intended to waive its immunity against suits in federal court alleging violations to URRMA. It is therefore recommended that the request for dismissal of all pendent state law claims asserted against the Commonwealth and DTOP on Eleventh Amendment immunity grounds be GRANTED.

## 2. Dismissal of Claims against AMA

AMA requests dismissal of all claims asserted in the Second Amended Complaint on two (2) grounds: (1) that it is immune from suit in federal court because it is entitled to Eleventh Amendment immunity; and (2) that the Second Amended Complaint fails to state any claim upon which relief could be granted. Dockets No. 58, 59. In particular, AMA contends that an analysis of the factors relevant to a determination of whether a governmental entity is an arm of the Commonwealth for purposes of Eleventh Amendment immunity clearly points to a conclusion that AMA is structures as an alter ego of the Commonwealth that is entitled to share the Commonwealth's sovereign immunity. The AMA supports its claim of entitlement to immunity on several grounds: (1) that although it is structured as a public corporation, the Commonwealth maintains significant control over its planning and administrative operations; (2) that it is subjected to the administrative control of the DTOP, being its Secretary the person who is responsible for supervising AMA's performance and appointing AMA's President and General Manager as well as all its officials; (3) that the AMA is obliged to submit to the Secretary of the DTOP financial statements and reports on the status and progress of all the undertakings and activities of the AMA at the closing of each fiscal year; (4) that AMA's purpose is governmental in nature; (5) that it is exempt from the payment of taxes on its revenues and properties; (6) that it is authorized to deposit only in institutions approved by the Department of the Treasury of the Commonwealth; (7) that substantially all of its employees participate in the Retirement System of the Commonwealth; and (8) that AMA is not financially independent from the Commonwealth, relying heavily on governmental subsidy to balance its budget. Therefore, AMA

**318**

claims, any damages that might be awarded in this case will be paid, at least in part, from the public treasury of the Commonwealth. All these factors, AMA asserts, undoubtedly suggests that AMA is structured as an arm of the Commonwealth cloaked with its immunity. Docket No. 59, pages 16–19.

### A. AMA's entitlement to Eleventh Amendment immunity.

Whether an entity is an arm of-the-state and thus protected by the states' Eleventh Amendment immunity is a question of federal law. *Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Ctr. Corp.,* 322 F.3d 56, 61 (1st Cir.2003). Because the Eleventh Amendment seeks to protect the state's interest in its public treasury and its " 'dignity' interest as a sovereign in not being haled into federal court [. . .] [i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." *Id.,* at 63.

In order to avoid such offense to the state's dignity, the First Circuit has adopted a two-part test to determine whether a particular entity is an arm-of-the-state. This test incorporates the twin interests served by the Eleventh Amendment: (1) protecting the state's dignity interest in avoiding being haled into federal court, *See Fed. Mar. Comm'n v. South Carolina Ports Auth.,* 535 U.S. 743, 760, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002), and (2) protecting the public fisc, *Edelman v.*

*Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

First, the court must determine "whether the state has structured the entity to share its Eleventh Amendment immunity." *Pastrana–Torres v. Corporación De Puerto Rico Para La Difusión Pública,* 460 F.3d 124, 126 (1st Cir.2006). In order to answer that inquiry, the court must ascertain: (1) whether the relevant law, by its own terms, makes the entity an arm of the state, or whether it is structured as a separate entity such that it may sue and be sued and has a budget that is independent from that of the Commonwealth; (2) whether the Commonwealth has explicitly claimed or disclaimed responsibility for the entity's debts; (3) whether the entity's functions may properly be characterized as those of a government; and (4) the degree of control over the entity that the state exercises, as manifested by its intrusion into the process of selection and removal of high ranking officials and board members within the entity and its power to veto the decisions of the relevant decision-makers within the entity. *Fresenius,* 322 F.3d at 68–72; *Pastrana–Torres,* 460 F.3d at 126–28.[8] If, after considering these factors, the court cannot conclude that the entity has been structured to share the state's sovereign immunity, the second part of the *Fresenius* test comes into play. *Id.* At that point, the focus is "on the risk that money damages will be paid from the state's treasury if the entity is found liable[, that is,] whether the state has obligated itself to pay the entity's debts." *Id.* If "it is clear that the state

---

**8.** Also relevant are the factors delineated in *Metcalf & Eddy,* 991 F.2d at 939–40 (1st Cir. 1993):(1) whether the agency has funding to satisfy its own judgments; (2) whether the agency's function is governmental or proprietary; (3) whether the agency is separately incorporated; (4) whether the state exerts control over the agency, and if so, to what extent; (5) whether the agency has the power to sue, be sued, and enter contracts in its name; (6) whether the agency's property is subject to taxation; and (7) whether the state has immunized itself from liability for the agency's acts or omissions.

treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." *Fresenius*, 322 F.3d at 65.

In analyzing the aforementioned factors, the Court looks to Puerto Rico law. *Pastrana–Torres*, 460 F.3d at 126 ("This determination [whether the Commonwealth had structured an entity to share its sovereignty] is a question of federal law but can be answered only after consulting the provisions of Commonwealth law that define [the entity's] character."); *see also Regents of the University of California v. Doe*, 519 U.S. 425, 429 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *Fresenius*, 322 F.3d at 61.

The Court disagrees with AMA's contention that it is structured as an alter ego of the Commonwealth cloaked with its Eleventh Amendment immunity. After reviewing AMA's Enabling Act, this Court is not convinced that AMA fulfills the criteria of the *Fresenius* test. Rather, a review of AMA's Enabling Act reveals several factors that show that AMA operates with a significant degree of autonomy from the Commonwealth. AMA was created as a "public corporation having legal existence and personality *separate and apart* from those of the Government and from any of the officers thereof." P.R. Laws Ann. tit. 23, § 603(a) (emphasis added); *See Fresenius*, 322 F.3d at 68 (relying on similar language to support a conclusion that an entity was not an arm of the state). Moreover, AMA operates, for constitutional purposes, as a private enterprise or business. P.R. Laws Ann. tit. 23, § 602(a). AMA's Enabling Act also empowers it to:

(1) have perpetual existence as a corporation; (2) sue and be sued; (3) enter into contracts leases, agreements, or other transactions with federal agencies, the Commonwealth or political subdivision thereof; (4) and acquire and maintain property. *Id.*, § 606; *see also Metcalf & Eddy*, 991 F.2d at 942 (power to sue and be sued and enter into contracts suggests autonomy from the state). Moreover, AMA is allowed to generate revenue by fixing, altering, charging and collecting reasonable rates, fees or rentals. P.R. Laws Ann. tit. 23, § 606(*l*); *see also Royal Caribbean v. Puerto Rico Ports Auth.*, 973 F.2d 8, 10 (1st Cir.2006) (ability of an entity to generate revenue suggests autonomy). Furthermore, AMA has authority to borrow money and issue bonds, and the Commonwealth (or any of its political subdivisions) will not be liable for the payment of the principal of or interest on any such bonds.[9] P.R. Laws Ann. tit. 23, § 606(n), (*o*). AMA is also permitted to accept grants or donations from persons and private entities and to acquire, hold and dispose of stock, contracts, bonds or other interests in other corporations. P.R. Laws Ann. tit. 23, § 606(p), (s).

Other factors, however, might suggest that AMA lacks autonomy and is an arm of the Commonwealth. For example, AMA is required to submit annual financial statements and status reports on certain subjects to the Governor and Legislature. *Id.*, § 620; *Royal Caribbean*, 973 F.2d at 12 (that entity must submit reports to the Governor is an indication of state control). AMA is also exempted from payment of Commonwealth and municipal taxes, duties and fees. P.R. Laws Ann. tit. 23, § 619;

---

9. AMA's Enabling Act clearly states that:
   The bonds issued by the Authority shall not be a debt of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions, and neither the Commonwealth of

Puerto Rico nor any such municipalities or political subdivisions shall be liable thereon, nor shall such bonds be payable out of any funds other than those of the Authority.
P.R. Laws Ann. tit. 23, § 616.

*Dogson v. University of Puerto Rico*, 26 F.Supp.2d 341, 344 (D.P.R.1998) (fact that University of Puerto Rico is exempt from payment of taxes and duties points to immunity). Finally, AMA is ascribed to DTOP; AMA's Board of Directors was eliminated and its powers and faculties transferred to the Secretary of the DTOP. *See* Section 3 of the 1971 Reorganization Plan No. 6, effective Jan. 2, 1973, P.R. Laws Ann. tit. 3, App. III.

Upon consideration of these factors, this Court cannot state that they clearly show that AMA is structured to share the Commonwealth's Eleventh Amendment immunity. While some factors point towards a structure that is independent of the state and its sovereignty, others point in the opposite direction. Because an examination of the factors pertinent to the first part of the *Fresenius* test proves inconclusive as to the central inquiry of whether the AMA is structured to share Puerto Rico's sovereign immunity, we turn to the second part of the test. Therefore, consideration has to be given to whether the Commonwealth is obligated to pay AMA's debts. *Fresenius*, 322 F.3d at 72.

In this case, AMA alleges that it is not financially independent from the Commonwealth because during the last decade it has received substantial funding from the Commonwealth. AMA states that this funding has proven essential to balance its annual budget and to sustain and maintain its normal operations, including the services provided by the Call and Ride program. AMA further asserts that, notwithstanding this funding, AMA continues to sustain budget shortfalls, which have ren-

dered AMA constantly dependent on the Commonwealth. AMA claims that in light of this situation, it can reasonably be concluded that any damages that might be awarded in this case will be paid, at least in part, from the public treasury of the Commonwealth. Docket No. 59, pages 18–19.

AMA's Enabling Act provides that the Commonwealth is not bound to assume any obligation to pay AMA's debts or to provide financial support to AMA. Nowhere in AMA's Enabling Act does the Commonwealth binds itself to subsidizing AMA's services. On the contrary, AMA's Enabling Act states that:

> The debts, obligations, contracts, bonds, notes, debentures, receipts, expenditures, accounts, funds, undertakings and property of the Authority, it officers, agents or employees *shall be deemed to be those of said government-controlled corporation and not to be those of the Commonwealth Government* or of any office, bureau, department, commission, dependency, municipality, branch, agent, officer or employee thereof.

P.R. Laws Ann. tit. 23, § 603 (emphasis added). This provision clearly grants fiscal autonomy to AMA. *See Canadian Transport Co. v. Puerto Rico Ports Authority*, 333 F.Supp. 1295, 1297 (D.P.R. 1971) (relying on identical language to conclude that Puerto Rico Ports of Authority was granted fiscal autonomy). Because the Commonwealth has no obligation to pay AMA's debts, AMA's claim for sovereign immunity fails to survive the second prong of the *Fresenius* analysis.[10] There-

---

**10.** The Court is aware, however, that even though AMA's Enabling Act clearly states that the Commonwealth assumes no obligation to pay AMA's debts, it could be that the Commonwealth has assumed that obligation in fact, either directly or indirectly, by providing virtually all the funds needed for the opera-

tion of AMA. *See Fresenius*, 322 F.3d at 72. Were that the case, AMA could still claim that it is entitled to Eleventh Amendment immunity. At this moment, the Court is in no position to ascertain whether, as a matter fact, the Commonwealth has assumed this obligation. This would require the Court to evaluate the

fore, this Court finds that AMA is not an arm of the Commonwealth and is not entitled to Eleventh Amendment immunity. It is therefore recommended that AMA's Motion to Dismiss on Eleventh Amendment immunity grounds be DENIED.[11]

## B. Claims under Title II of ADA and the Rehabilitation Act.

After having concluded that AMA is not entitled to sovereign immunity because it is not an arm of the Commonwealth, it is unnecessary to entertain an analysis as to whether AMA waived its alleged immunity against claims under Title II of ADA or the Rehabilitation Act by accepting federal funds. The Court notes, however, that even if AMA were an arm of the Commonwealth entitled to sovereign immunity, AMA would not be immunized as to the claims asserted by Plaintiffs under the Rehabilitation Act. As stated before, the Second Amended Complaint asserts that AMA received federal funds from the U.S. Department of Transportation to fund part of its operations. Docket No. 45, ¶ 11. AMA has not denied that it receives federal funds. As Plaintiffs correctly state, AMA's acceptance of those funds operates as a waiver of the Eleventh Amendment immunity against claims under the Rehabilitation Act. *See* 42 U.S.C. § 2000d–7(a)(1); *see also Diaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 33 (1st Cir.2006); *Nieves–Marquez v. Puerto Rico,* 353 F.3d 108, 127–30 (1st Cir.2003) (since the Department of Education voluntarily receives millions of dollars in federal funding, it effectively waived any Eleventh Amendment immunity as to Rehabilitation Act claims). Hence, it is recommended that AMA's request for dismissal of the claims under ADA's Title II and the Rehabilitation Act be DENIED.

## C. Claims under Sections 1981 and/or 1981a, 1983, and 1985.

Plaintiffs' claims against AMA under Section 1981 and/or Section 1981a should be dismissed relying on the same grounds considered to dismiss the claims under these sections against the Commonwealth and DTOP. The Second Amended Complaint does not allege any facts that could sustain a claim against any defendant in this case under Section 1981 (racial discrimination) and Section 1981a (employment discrimination context). *See supra,* § 1(C)(1).

exhibits attached to AMA's Motion to Dismiss, which AMA offered in an effort to show that a great part of the funding that AMA needs to operate comes from Commonwealth. As stated before, the Court can not evaluate those exhibits without converting AMA's Motion to Dismiss into a Motion for Summary Judgment, which the Court has refused to do. Moreover, if the Court were to make such a conversion, Plaintiffs would have to conduct discovery as to the issues raised by the exhibits in order to be able to present arguments, if any, to oppose AMA's claim for sovereign immunity. This issue may be more amenable to final disposition via summary judgment motions, once the parties have conducted discovery as to this specific issue.

**11.** In *Rodriguez–Velazquez v. Autoridad Metropolitana de Autobuses,* No. 03–2331, 2007 WL 1188261 (D.P.R. Apr.19, 2007), a case in which AMA raised Eleventh Amendment immunity as to claims under Title I of ADA, this Court held that:

> Other than raising the immunity defense, AMA has not met its burden of pointing to the evidence indicative that it is indeed an alter ego of the Commonwealth of Puerto Rico and entitled to Eleventh Amendment protection. Rather, AMA's organic act specifically provides that it is a "public corporation having legal existence and personality separate and apart from those of the Government" with an independent economic existence.

Even though *Rodriguez–Velazquez* is not a Title II case, the Court finds its sovereign immunity analysis persuasive.

The claims under Sections 1983 and 1985 against AMA should likewise be dismissed on very similar grounds than those relied to dismiss those same claims against the Commonwealth and DTOP. Although in this case the Eleventh Amendment to the U.S. Constitution does not immunize AMA against said claims, AMA is still not a "person" within the meaning of Sections 1983 and 1985. *See Nadal v. Puerto Rico Tourist Development Co.*, 399 F.Supp. 1222 (D.P.R.1975) (Puerto Rico Tourist Development Company, a public corporation and instrumentality of Commonwealth government, was not a "person" within the meaning of Section 1983). Because AMA is not a "person" for purposes of Section 1983, it is also not a "person" for purposes of Section 1985 *See supra*, § 1(C)(2). It is therefore recommended that all claims against AMA under Sections 1981 and/or 1981a, 1983 and 1985 be DISMISSED.

### D. Claims under Commonwealth law.

The AMA also relies on the same argument as the Commonwealth and DTOP to request dismissal of the claims under Commonwealth law. AMA asserts that, even if its acceptance of federal funds imply a waiver of sovereign immunity as to the federal law claims, AMA would still be entitled to Eleventh Amendment protection as to the pendent state law claims. Having reached the determination that AMA is not an arm or alter ego of the Commonwealth, this Court concludes that it is not entitled to Eleventh Amendment immunity protection against the pendent state claims either. In other words, AMA does not enjoy sovereign immunity against federal and state law claims.

This, however, is not entirely dispositive of AMA's argument. Even though AMA does not enjoy sovereign immunity as to the Commonwealth claims, this Court could still decide not to exercise jurisdiction over such claims. In fact, AMA argues that after a careful reading of the Second Amended Complaint, and after "sifting through the mesh. of allegations" contained therein, the Second Amended Complaint asserts nothing more than an alleged violation of local law. According to AMA, Plaintiffs' claims regarding the rate increase for the services provided by the Call and Ride program are the gist and the "real body" of the Second Amended Complaint, and that the claims regarding the cancellation of the reservations to be transported to the Capitol to participate in the hearings is only an appendage. AMA contends that even if the claims related to the rate increase were true, this would only amount to a violation of the URRMA. AMA requests that the Court abstain from exercising supplemental jurisdiction over the rate increase claims or any other pendent state claim because those claims do not arise from a common nucleus of operative facts shared with the cancellation of the reservations of rides to the hearing at the Capitol. Docket No. 59. Pages 21–25.

█ Pendent jurisdiction exists whenever there is a claim arising under the Constitution, the Laws of the United States, and treaties made under their authority and the relationship between that claim and the state claim can be found to constitute, but one constitutional case. The state claims must be linked to the federal claim by a "common nucleus of operative facts", and must be sufficiently substantial to confer federal court jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Confederacion Laborista De Puerto Rico v. Cerveceria India, Inc.*, 607 F.Supp. 1077, 1081 (D.P.R.1985).

In *Gibbs*, 383 U.S. at 726, the Supreme Court ruled that a federal court should consider and weigh in each case, and at

every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice. *See Martinez v. Colon,* 54 F.3d 980, 990 (1st Cir.1995).

The preferred approach is pragmatic and case-specific. Thus, in "an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims." *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995); *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996).

The exercise of pendent jurisdiction is discretionary. In view of the fact that some of Plaintiffs' federal claims against AMA, the Commonwealth and DTOP survive the Motion to Dismiss and upon an assessment of judicial economy and fairness to litigants, the Court should exercise pendent jurisdiction as to Plaintiffs' Commonwealth claims against AMA. Plaintiffs implicitly claim that the same discriminatory intent that was used to increase the rates without duly notifying disabled persons was present in the scheme to deny them transportation to the Capitol hearing that took place as part of an investigation regarding, precisely, the way that said increase was adopted and implemented. Making all reasonable inferences in Plaintiffs' favor, the Court finds that there is a sufficient link between the federal and state claims. It is therefore recommended that AMA's request for dismissal of the

supplemental Commonwealth claims be DENIED.

### 3. Dismissal of claims against co-defendants Alcaraz–Emanuelli, González–Baker and Mirabal.

Co-defendants Alcaraz–Emanuelli, González–Baker and Mirabal limit their request for dismissal to the claims asserted against them, in their individual capacity, under ADA and the Rehabilitation Act, while in both their individual and official capacity as to Section 1983. With respect to ADA and the Rehabilitation Act, these co-defendants contend that no personal liability exists under these statutes. With respect to the Section 1983 claims, they contend that, when sued in their official capacity, they are not "persons" for purposes of that section and, when sued in their individual capacity, said claims must be dismissed on *respondeat superior* grounds and because they are entitled to qualified immunity.

### A. Claims under ADA and the Rehabilitation Act.

Co-defendants Alcaraz–Emanuelli, González Baker, Torres–Santiago and Mirabal request dismissal of the ADA claims asserted against them in their individual capacity because "[n]umerous cases in the District of Puerto Rico have already determined that no personal liability exists under Title VII and that individual defendants are not liable under Title VII." Docket No. 9, pages 5–6. Indeed, no personal liability can attach to agents and supervisors under Title VII. *See Sanchez–Ramos v. Puerto Rico Police Dept.,* 392 F.Supp.2d 167, 179 n. 6 (D.P.R.2005). Their argument, however, is misplaced inasmuch they resort to Title VII to request dismissal of claims asserted under ADA. The Court, however, will focus its analysis as if said co-defendants had requested dis-

missal on the grounds that the cases decided by this District have determined that no personal liability attaches under ADA, instead of Title VII. Furthermore, the Court will extend its analysis to the Rehabilitation Act claims, although co-defendants Alcaraz–Emanuelli, González Baker, Torres–Santiago and Mirabal do not formally request dismissal of said claims.

Neither the First Circuit Court of Appeals nor the U.S. Supreme Court have decided whether individual/personal liability may be attached to agents or supervisors under the ADA and the Rehabilitation Act. *See Castro Ortiz v. Fajardo,* 133 F.Supp.2d 143, 150 (D.P.R.2001); *Serapion v. Martinez,* 119 F.3d 982, 992 (1st Cir.1997); *Oliveras–Sifre v. P.R. Dept. of Health,* 214 F.3d 23, 27 (1st Cir.2000). This District has consistently held, however, that no personal liability may be imposed. *Figueroa–Garay v. Municipality of Rio Grande,* 364 F.Supp.2d 117, 130 (D.P.R.2005); *Vicenty Martell v. Estado Libre Asociado de P.R.,* 48 F.Supp.2d 81, 87 (D.P.R.1999); *Sifre v. Department of Health,* 38 F.Supp.2d 91, 105–106 (D.P.R. 1999); *Figueroa v. Fajardo,* 1 F.Supp.2d 117, 120 (D.P.R.1998); *Rivera Rodriguez v. Police Dept. of Puerto Rico,* 968 F.Supp. 783, 785–786 (D.P.R.1997); *Moreno v. John Crane, Inc.,* 963 F.Supp. 72, 76 (D.P.R.1997); *Anonymous v. Legal Serv. Corp.,* 932 F.Supp. 49, 50–51 (D.P.R.1996). Therefore, it is recommended that the claims asserted under ADA and the Rehabilitation Act against co-defendants Alcaraz–Emanuelli, González Baker, Torres–Santiago and Mirabal in their individual capacity be DISMISSED.

### B. Claims against co-defendants Alcaraz–Emanuelli, González–Baker and Mirabal in their official capacity.

In general terms, state officials sued in their official capacity are not "persons" within the meaning of Section 1983. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). However, a state official in his official capacity, when sued for injunctive relief, would be a person under Section 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Id.,* n. 10. Because the Second Amended Complaint requests injunctive relief, co-defendants Alcaraz–Emanuelli's, González–Baker's and Mirabal's could be considered "persons" under Section 1983. Hence, it is recommended that their request for dismissal of the Section 1983 claims for injunctive relief asserted against them in their official capacities be DENIED.[12]

However, it is recommended that any Section 1983 monetary claims against these codefendants in their official capacity be DISMISSED on Eleventh Amendment immunity grounds. The Eleventh Amendment has been interpreted to bar suits for monetary relief against state officers in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Culebras Enterprises Corp.,* 813 F.2d at 516 (1st Cir.1987). "The rationale behind this extension of the Eleventh Amendment is that a claim against a state official in his or her official capacity for monetary relief is an action for the recovery of money from the State ... Hence, a claim against a state official

**12.** Should the Court decide to take judicial notice of the fact that co-defendant Alcaraz–Emanuelli resigned to his position as Secretary of the DTOP, this Court recommends that the claim for injunctive relief asserted against him be dismissed. If co-defendant Alcaraz–Emanuelli no longer holds any job or position at the DTOP, it is clear that he can not provide the prospective relief sought by Plaintiffs through the injunctive relief requested.

for monetary relief is, in essence, a claim against the State." *Torres Ocasio v. Melendez,* 283 F.Supp.2d 505, 511 (D.P.R. 2003) (citations omitted).

### C. Claims against co-defendants Alcaraz–Emanuelli, González–Baker and Mirabal in their individual capacity.

Co-defendants Alcaraz–Emanuelli, González–Baker and Mirabal request dismissal of the monetary claims asserted against them in their individual capacity under Section 1983 on *respondeat superior* grounds. They allege that under Section 1983, supervisory liability may only be imposed under certain circumstances, none of which are present in this case. According to these codefendants, the Second Amended Complaint fails to establish a claim against them because (1) none of the facts alleged therein could affirmatively link the alleged constitutional violations suffered by Plaintiffs to their actions and/or omissions as supervisors and (2) their conduct can not be characterized as supervisory encouragement, condonation, acquiescence or gross negligence amounting to deliberate indifference to Plaintiffs' rights as required to impose personal liability upon them for their failure to supervise their subordinates. Said co-defendants also claim entitlement to qualified immunity as to the monetary claims asserted against them in their individual capacity. Docket No. 9, pages 7–10.

### 1. Unavailability of *Respondeat superior* liability

Liability may not be predicated upon a theory of *respondeat superior. Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901–02 (1st Cir.1988); *Guzman v. City of Cranston,* 812 F.2d 24, 26 (1st Cir.1987). A supervisor "may be found liable only on the basis of her own acts or omissions." *Figueroa v. Aponte–Roque,* 864 F.2d 947, 953 (1st Cir.1989). It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others. *Gutierrez–Rodriguez,* 882 F.2d at 562; *Germany v. Vance,* 868 F.2d 9, 17–18 (1st Cir.1989). An official displays such reckless or callous indifference when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights. *Vance,* 868 F.2d at 18. Finally, there must be an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials. *Rizzo v. Goode,* 423 U.S. at 371; *Lipsett,* 864 F.2d at 902; *Gutierrez–Rodriguez,* 882 F.2d at 562.

The Second Amended Complaint contains limited and unspecific allegations as to codefendants' Alcaraz–Emanuelli's, González–Baker's, and Mirabal's role as supervisors or personal involvement in the events alleged in therein. As to each of them, the Second Amended Complaint only states that: (1) co-defendant Alcaraz–Emanuelli was responsible for the supervision of the performance of AMA and its compliance with all applicable federal and state laws and regulations, and that he became an "after the fact co-conspirator" in the allegedly illegal actions taken by Torres–Santiago because he failed to take any corrective measures; (2) co-defendants González–Baker and Mirabal participated with Torres–Santiago in the planning and execution of the discriminatory actions alleged by Plaintiffs. Docket No. 45, ¶¶ 9–10, 37–38. Although the allegations contained in the Second Amended Complaint are not a model of specificity, the record is not ripe yet for a determination as to whether the alleged conduct of co-defendants Alcaraz–Emanuelli, González–Baker, and Mirabal amount to conduct that meets the reckless or callous indiffer-

ence standard required to impose liability on them. This issue might be more amenable for adjudication through summary judgment motions at a later stage. It is therefore recommended that their request for dismissal of the monetary Section 1983 claims asserted against them in their individual capacities on *respondeat superior* grounds be DENIED.

### 2. Qualified immunity

"Government officials performing discretionary functions generally are shielded from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment." *Santana v. Calderon*, 342 F.3d 18, 23 (1st Cir.2003) (*quoting Ryder v. United States*, 515 U.S. 177, 185, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995)).

Based on Supreme Court precedent, the First Circuit employs a three-part test when determining if a public official is entitled to qualified immunity: (1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue. *Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir. 2004).

The request for immunity must be rejected if there is no issue as to the existence of a particular statutory or constitutional right which a reasonable public official should be aware of. The qualified immunity inquiry must start with the court ascertaining whether or not plaintiff has pled sufficient facts to denote violation of a constitutional right. *Santana*, 342 F.3d at 23; *Concepcion v. Zorrilla*, 309 F.Supp.2d 201, 213 (D.P.R.2004).

This Court has already concluded that the facts alleged in the Second Amended Complaint could implicate, at least, Plaintiffs' rights under the First Amendment to the U.S. Constitution, namely the right to be free from prior restraint of expression undertaken without appropriate procedural safeguards. Moreover, it would be difficult to dispute, and Defendants have not attempted to do so, that this right was clearly established by the time the alleged cancellation of the reservations took place or that a similarly situated reasonable official would not have understood that the challenged actions violated this right. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 ("For many years it has been clearly established that 'any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity.' ").[13] Thus, co-defendants Alcaraz–Emanuelli, González–Baker and Mirabal are not entitled to qualified immunity. It is therefore recommended that their request for dismissal of the Section 1983 claims asserted against them in their individual capacity on qualified immunity grounds be also DENIED.

### 4. Punitive Damages claims.

Plaintiffs request in the Second Amended Complaint that the Court impose puni-

---

13. *See also Gerena v. Santini*, 382 F.Supp.2d 284, 290 (D.P.R.2005) (it was clearly established law by the time the Board of Directors of the Tapia Theater in San Juan cancelled a play before its debut due to its content, that such an exercise of prior restraint of expression could not be undertaken without appropriate procedural safeguards).

tive damages in the amount of at least $1,000,000.00 per defendant. Plaintiffs justify this request by stating that the punitive damages are necessary in light of the "seriousness of the situation, and to set an example so that abuses like this against our most vulnerable citizens don't happen again." Plaintiffs also request that this amount be paid, in the case of the individual defendants, out of their own resources and not from the resources of the people of Puerto Rico. Docket No. 45, ¶ 53. Defendants requests dismissal of the punitive damages claims alleging that neither ADA nor the Rehabilitation Act allows for the imposition of such damages. Docket No. 9, pages 10–11.

■ The Supreme Court has stated that punitive damages are unavailable under ADA and the Rehabilitation Act. *Barnes v. Gorman*, 536 U.S. 181, 189, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) ("Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act."); *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 27, 29 (1st Cir. 2006). But under Section 1983, punitive damages could be imposed. A jury may levy punitive damages in a section 1983 action when a defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see also Iacobucci v. Boulter*, 193 F.3d 14, 25–26 (1st Cir.1999). In order for punitive damages to be appropriate, there must be "proof that the defendant acted 'in the face of a perceived risk that [his] actions [would] violate federal law.' " *Iacobucci*, 193 F.3d at 26.

The Second Amended Complaint does not specify under which statute or statutes Plaintiffs request punitive damages. However, claims are asserted against Defendants under ADA, Rehabilitation Act and Section 1983. As the above discussion demonstrates, Plaintiffs are not entitled to punitive damages under ADA and the Rehabilitation Act. But Plaintiffs may be entitled to punitive damages under Section 1983. It is therefore recommended that Defendants request for dismissal of the punitive damages claims be GRANTED with respect to ADA and the Rehabilitation Act, but DENIED with respect to Section 1983.

## V. CONCLUSION

In view of the foregoing, it is recommended that Defendants' Motions to Dismiss (Dockets No. 9, 18, 58 and 59) be GRANTED IN PART and DENIED IN PART. The Court recommends that:

1) the Commonwealth's and DTOP's request for dismissal of the claims under Title II of ADA on Eleventh Amendment immunity grounds be DENIED;

2) the Commonwealth's and DTOP's request for dismissal of the claims under the Rehabilitation Act on Eleventh Amendment immunity grounds be GRANTED;

3) the Commonwealth's and DTOP's request for dismissal of all claims under Sections 1981 and/or 1981a, 1983, 1985 and 1988 be GRANTED;

4) the Commonwealth's and DTOP's request for dismissal of all claims under Commonwealth law on Eleventh Amendment immunity grounds be GRANTED;

5) AMA's request for dismissal of all claims asserted in the Second Amended Complaint on Eleventh

Amendment immunity grounds be DENIED;

6) AMA's request for dismissal of all claims under Sections 1981 and/or 1981a, 1983, 1985 and 1988 be GRANTED;

7) AMA's request for dismissal of all claims under Commonwealth law be DENIED;

8) Co-defendants Alcaraz–Emanuelli's, González–Baker's and Mirabal's request of dismissal of the claims asserted against them under ADA and the Rehabilitation Act in their individual capacity be GRANTED;

9) Co-defendants Alcaraz–Emanuelli's, González–Baker's and Mirabal's request of dismissal of the Section 1983 claims for injunctive relief asserted against them in their official capacity be DENIED (unless the Court is willing to take judicial notice of the fact that Alcaraz–Emanuelli is not DTOP's Secretary at the present);

10) Co-defendants Alcaraz–Emanuelli's, González–Baker's and Mirabal's request of dismissal of the Section 1983 monetary claims asserted against them in their official capacities be GRANTED;

11) Co-defendants Alcaraz–Emanuelli's, González–Baker's and Mirabal's request of dismissal of the monetary Section 1983 claims asserted against them in their individual capacities on *respondeat superior* and qualified immunity grounds be DENIED; and

12) Defendants' request for dismissal of the punitive damages be GRANTED with respect to ADA and the Rehabilitation Act, but DENIED with respect to Section 1983.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia,* 792 F.2d 4 (1st Cir. 1986).

May 16, 2007.